[No. H002027. Sixth Dist. Nov. 19, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIAS ZENDEJAS, Defendant and Appellant.

**COUNSEL**

Steven L. Whiteside, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Mark S. Howell and Jeffrey M. Bryant, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BRAUER, J.**—The court below, sitting without a jury, found appellant Elias Zendejas guilty of (1) threatening a public employee, a felony (Pen. Code, § 71); (2) making an annoying telephone call, a misdemeanor (Pen. Code, § 653m, subd. (a)); and (3) carrying a concealable firearm concealed within his vehicle, a misdemeanor (Pen. Code, § 12025, subd. (a)). The court suspended imposition of sentence and placed Zendejas on probation

for three years, on certain specified conditions. Zendejas appeals from the order granting probation.

On appeal Zendejas challenges only his felony conviction. In essence he contends that as a matter of law, his conduct did not violate the provisions of Penal Code section 71. He also challenges the constitutionality of a portion of that statute. We find his arguments unmeritorious, and we therefore affirm the judgment.

## I. FACTS

In 1981 Zendejas became employed as a diesel mechanic at the Santa Clara Transportation Agency (hereinafter Transit). He worked in the overhaul and repair department, repairing and maintaining county buses. All went well for about the first six months; and then Zendejas became involved in a series of disputes with his immediate yard supervisors. At one point he slipped, fell, and injured his back, an injury for which he subsequently filed a workers' compensation claim. Then in November of 1982 he had a verbal confrontation with one of his supervisors about cleaning floors. Zendejas walked off the job, and was thereupon terminated. After about a month, apparently through the efforts of union representatives, he was rehired.

According to Zendejas, working conditions did not improve. He was transferred from the overhaul and repair department to the South County Yard. He claimed he was verbally abused and insulted by both superiors and fellow employees. Finally in March of 1983, unable to stand the strain, he sought and obtained a leave of absence. At the time of trial, which was held in January of 1986, he still had not returned to work for Transit.

In April of 1984 there was an arbitration hearing concerning Zendejas's workers' compensation claim, the upshot of which was that Transit put him on what the record describes as a "medical leave of absence." Thereafter Zendejas received compensation checks, but he claimed that he returned them, and never received a penny. In his words: "It just, I really could have used all of my benefits, but I know that I would need the benefits if I went back. I'd just go crazy working for them again. And I decided, no more. They can keep their money. I don't need this. I mean, I don't need their benefits. I mean, there's no way I could ever get any respect from them and I had already lost respect for them. I have nothing but contempt. I admit it."

In August of 1984 Zendejas obtained another job as a mechanic with a Chevron gas station. He did not inform Transit of this fact.

During this period several things occurred, which from the record before us we cannot put in accurate chronological order. First, Transit sent to Zendejas a number of letters inquiring when Zendejas intended to return to work; many of the letters Zendejas tore up, unread. Second, Zendejas noticed that Transit personnel in marked cars drove by his residence on two or three occasions. Once a Transit security guard dropped into the Chevron station where Zendejas worked. Third, Zendejas became discouraged with his own lawyers, and stopped communicating with them. By early 1985 Zendejas decided that he wanted nothing more to do with Transit or any of its representatives.

On March 6, 1985, the attorneys representing Transit in the workers' compensation proceedings wrote to Zendejas, saying that they intended to move for a dismissal of his application. We have set forth the full text of that letter in the margin.[1] Zendejas responded to that letter with a four-page handwritten letter of his own, dated March 23, 1985. The text of that letter is also set forth in the margin.[2] Zendejas's letter foreshadowed events to come.

---

[1] The March 6, 1985, letter to Zendejas reads as follows: "Dear Mr. Zendejas: [¶] In regard to the above-captioned case, there has been no activity for over one year and it is my understanding you did not keep your appointment with Dr. Goldfield that had been scheduled by your previous counsel. [¶] I am writing this letter to you direct, since it is my understanding that you are not represented by counsel and do not intend to be so represented. [¶] Due to the fact that this case has been inactive, with no indication of you intending to pursue the same, I will be filing a Petition to Dismiss the Application. This Petition will be filed with a request for a dismissal, 30 days from the date of this letter. [¶] Very truly yours, /s/ ALVIN M. FRANK."

[2] Here we attempt to reproduce from a bad photocopy Zendejas's letter dated March 23, 1985. The underlining and the misspellings appear in the photocopy.

"To: Gasset Perry & Frank

"From: Elias zendejas

"Subject: Your letter dated 3/6/85

"I was not going to write you, but a *County Transit Security Guard* came in to the station I work. Seeing this man & knowing who he works for all the *hate* I had in my hart started coming out again, remembering the way I was treated. [¶] Please tell your guards bus drivers to not come into my station (where I work I can not help you or anyone affiliated or connected to the Transit.) [¶] For the record I don't know who is 'Goldfield'? and don't give a dam. You represent a lot of liars, thieves, drug addicts, and very 'good' (bad & evil) 'bullshitters'. Worst of all you must be nonbelievers. (Athiasts.) [¶] I have been intimidated, harrased, insulted, threatened, slandered, & lied to. [¶] I have no *representation*. Is my former lawyer working for or on some of your cases? [¶] I am only one man I can't fight so many of you. [¶] You have beat me. *I hope you are proud,* also to represent animals that could never call them selves *human,* or men. [¶] I am not and never have been crazy. I pray to *God* your cliants pay. *Some of your cliants pushed me just inches to the point of killing.* Your cliants have beat me, you tell those animals they are *very lucky I am a Christian.* I have no blood on my hands, not even of *dogs.* [¶] Some people continue to ask me questions. I tell them the *truth.* The County Transit & you only believe what you want to believe. [¶] I send this letter to work some of your cliants do not: insult me; call me names; bother me or threaten me. [¶] I pray that God gives me strength to control this hate I have of some of your cliants. I hope none of you are

On May 9, 1985, Richard Pickering, Transit's support services manager, signed a letter which was mailed to Zendejas. In pertinent part the letter said: "As you have now been on medical leave for a period of two years (4/30/83 - 4/30/85), you are requested to present written proof of medical clearance from your physician to reinstate you to full duty. [¶] Failure to comply within five days from receipt of this notice will result in termination of your employment with the District. [¶] Questions relative to this action should be directed to myself or your union representative. [¶] Sincerely, /s/ R. Pickering."

When he returned home from work the following day, May 10, 1985, Zendejas read Pickering's letter. He became very angry, and that evening he made at least two telephone calls to Transit, in which he threatened Pickering. One call was recorded by an answering machine; a tape of that call, admitted in evidence as exhibit 1, was played at trial. The tape contains the following message: "I want to leave a message for Mr. Pick—Pickering, or something like that? Uh, my name is Elias Zendejas, I received a letter. Mr. Pickering, you better stop sending me letters. You better stop talking to me. I sent you a letter to your attorney for the Santa Clara County Transit, or I'm gonna come down with a gun and blow your fuckin' brains out. Do you hear me, you son of a bitch?"

Another telephone call from Zendejas was received about 11 p.m. at Transit's communications center by Patricia Mejia, an assistant monitor. This call also was tape-recorded; the tape was admitted in evidence as exhibit 2 and played at trial. The tape discloses that Zendejas gave his name, and said he wanted to leave a message for Pickering. Mejia replied that Zendejas would have to call Pickering's office the following Monday. Zendejas declined to do so. Mejia explained that Pickering did not work in that office, and in fact she did not know who he was. Zendejas's response was this: "Well, he's, he's, he's your boss, okay and you tell him this. If he keeps bothering me and I, you know where I live—1703 Cooley Drive—you keep bothering me and I'm going to take a gun and blow out his fuckin' brain. My name is Elias Zendejas, I means this seriously, I don't want to be

foolish enough to play with me again. I am very tired leave me alone. [¶] I will never take the same *shit* from your cliant again. [¶] Your cliants wronged me, mistreated me, hurt me. [¶] *Do not* push me any farther. I will give the same measure of pain to any of you & 10% more in retribution for the pain *I have suffered.* [¶] So help me God! don't take this litly. [¶] Please stay away with your lies, for your sake & mine. I have nothing but hate left for your cliants and I *can not* forget or forgive. I suffered very much because I took the advise of my lawyers & union & County Transit Managers. [¶] Your cliants *can* cover it up & you can to, but *God* knows I suffered and knows the truth. [¶] Some of you treated me like a *coward.* Your fools don't know that a real *man* tries to do the *Christian way of life.* [¶] Next time you hurt me I will hurt you. [¶] Be Very Carefull, /s/ *Mr. Elias Zendejas.* I will never *dismiss* this injustice."

bothered by the County Transit District for anything. I don't want no more registered letters, I'm sick and tired." Mejia tried to reach Pickering at home, but was unable to do so, and so she left a message about the call on Pickering's answering machine.

Pickering did not know Zendejas personally, but he was aware that Zendejas was on medical leave. He had also read Zendejas's letter of March 23, 1985 (see fn. 2, *ante*). Pickering first listened to exhibit 2 on Monday, May 13, 1985. After hearing the tape he became very concerned. He talked to three persons who had worked with Zendejas; they told him that Zendejas was an unstable person, very difficult to work with, "and that he could be in a state of mind to carry out that threat." Accordingly Pickering removed the Transit logo from his car. He also asked Transit security personnel to try to locate Zendejas's place of employment, so that he would not encounter Zendejas accidentally.

Also on May 13, shortly before 5 p.m., a Transit personnel clerk received yet another telephone call from Zendejas. This call, which lasted between 15 and 20 minutes, was not recorded. According to the clerk, the caller identified himself as Zendejas; "[g]enerally he was angry and he was threatening to kill people or to blow their brains out"; he mentioned Pickering, but mispronounced that name; and he also mentioned one of his old supervisors. He further said he had no intent to return to work, and that essentially he wanted the county to leave him alone.

The next evening, May 14, 1985, at approximately 7 p.m., a Transit security agent drove by Zendejas's residence, for the purpose of checking license numbers to ascertain what vehicles belonged to Zendejas. On the first pass the agent noticed nothing unusual; but on the second pass he saw Zendejas standing near the rear of a pickup truck, holding a rifle.

On May 22, 1985, as Zendejas was driving away from his home, he was stopped by an investigator from the district attorney's office. The investigator had a warrant which authorized a search of Zendejas's residence and automobiles for weapons and ammunition. The investigator discovered (a) a loaded .22 caliber pistol in the glove box of the car Zendejas was driving, and (b) a loaded Luger pistol, a .38 caliber revolver, and a rifle, all inside Zendejas's residence.

## II. DIRECT COMMUNICATION

In pertinent part Penal Code section 71 reads as follows: "Every person who, with intent to cause, attempts to cause, or causes . . . any public officer or employee to do, or to refrain from doing, any act in the perfor-

mance of his duties, by means of a threat, *directly communicated to such person,* to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out, is guilty of a public offense . . . . [¶] As used in this section, 'directly communicated' includes, but is not limited to, *a communication to the recipient* of the threat by telephone, telegraph, or letter." (Italics added.)

■ Zendejas first contends that his conduct did not violate Penal Code section 71 because his threats were not "directly communicated" to Pickering. He points out that in one instance he left a message on an answering machine, and in another instance he conversed with a Transit employee. ■ He did not, however, raise this argument in the trial court, and so our first task is to determine whether he is entitled to raise it here.

### A.

At the close of the prosecution's case Zendejas moved for a judgment of acquittal on the felony count. He argued that the application of Penal Code section 71 to the facts of his case denied him equal protection of the law, because the statute elevated to the level of a felony conduct which, if directed toward a private employer, would only amount to a misdemeanor. The court's response was: "Well, it's an interesting argument. However, I don't accept it. I think that working for a public employer entails some benefits and some burdens and the statute was written in such a way that the proof made by the district attorney is sufficient, in my judgment, to withstand the motion. The constitutional attack, I do not consider to be meritorious. Therefore, the motion is denied." The issue of direct communication was never raised.

But the California Supreme Court has held that in criminal cases the grounds for a motion for judgment of acquittal need not be specified. "In giving substance to this right, the Legislature provided that a motion to acquit could be made by either the defendant or the trial court, without any requirement that the motion be made in a particular form. The Attorney General nevertheless contends that appellant's motion to acquit made pursuant to [Penal Code] section 1118 should have included a statement of specific grounds. However, to so construe this section would force a defendant to face the same kind of dilemma from which the Legislature sought to extricate defendants. In effect, a defendant would be forced to choose between: (1) specifying the defects in the prosecution's case, thereby affording the prosecutor an opportunity to seek to reopen the case in order to cure such defects; (2) making no motion and resting, thereby sacrificing his right to present a defense for fear that later evidence might cure the defects in the prosecution's case; or (3) making no motion, thereby waiving the right to

challenge the prosecution's case-in-chief, and proceeding to present a defense. Forcing a defendant to elect among these alternatives would deny him the intended protection of the section. Further, to require a defendant to state specific grounds in support of the motion for acquittal would place the burden upon him to point out to the prosecutor, as well as to the court, the gaps in the prosecution's case. Such a requirement would come perilously close to compelling a defendant to aid in his own prosecution and would lessen the prosecutor's burden to prove each and every element of the case beyond a reasonable doubt." (*People* v. *Belton* (1979) 23 Cal.3d 516, 521-522, fns. omitted [153 Cal.Rptr. 195, 591 P.2d 485].)

■ We are bound to follow decisions of the California Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 456 [20 Cal.Rptr. 321, 369 P.2d 937].) ■ Therefore we turn to the merits of Zendejas's argument.

## B.

To date no reported California decision has addressed the meaning of the phrase "directly communicated" used in Penal Code section 71. A glance at an English dictionary reveals that the word "directly" has a number of meanings. Zendejas would have us interpret the word "directly" to mean "without any intervening agency." He argues that exhibit 2 (the tape of his conversation with Mejia) was given to Pickering by other Transit employees, and therefore the message was transmitted by an intervening agency.

The statute itself belies the interpretation suggested by Zendejas. The statute expressly provides that the phrase " 'directly communicated' includes, but is not limited to, a communication to the recipient of the threat by telephone, telegraph, or letter." Each of these methods of communication may involve an intervening agency. A letter usually is delivered by postal personnel, and is in many cases opened and/or read by a secretary or mail sorter. A telegram may either be hand delivered, or its message read to the recipient on the telephone by a telegraph employee. In the case of a telephone call, the caller may leave a message with the recipient's secretary; and if that message is subsequently given to the recipient, there has been a communication despite the presence of an intervening agency.

The Attorney General reached a similar conclusion in an opinion written in 1980. There the following question was posed: "2. Under Penal Code section 71, is a threat to a public officer 'directly communicated' to the officer where it is communicated by telephone or letter and received by a secretary or other employee of the officer and turned over to the police?" (63 Ops.Cal.Atty.Gen. 5, 6 (1980).) The Attorney General reasoned that a

message which is turned over to the police without reaching the public officer is not "directly communicated" to that officer. The opinion concludes thus: "The last sentence of section 71, quoted above, demonstrates that the Legislature did not intend the words 'directly communicated' to limit the methods by which a threat may be conveyed to a public officer. Consequently, if a threat intended for a public officer were contained in a letter which was delivered to the officer's secretary, who in turn delivered it to the officer, the threat would be directly communicated. [¶] By the use of the word 'directly' we believe the Legislature intended that the threat must be communicated to the officer by the method of communication selected by the person making the threat and delivered in a manner normally utilized by that method of communication. We conclude the Legislature used the word 'directly' intending it to have its ordinary meaning and thus require that a threat *must reach the public officer personally* to be 'directly communicated' to the officer within the meaning of section 71." (*Id.,* at p. 8, italics added.)

A message never given the recipient is not a true communication. But the plain intent of the statute is to prevent threatening communications to public officers or employees designed to extort their action or inaction, no matter how the communication is made.

■ Any statute which purports to make speech criminal bears a potential of transgressing the First Amendment to the United States Constitution. For example, in a case where members of the Klu Klux Klan advocated violence against minorities, the United States Supreme Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to produce such action." (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447, fn. omitted [23 L.Ed.2d 430, 434, 89 S.Ct. 1827].)

In *Watts* v. *United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399] a protester at a political rally announced that he would not allow himself to be drafted into military service. Among other things he said: " 'I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L. B. J.' " (*Id.,* at p. 706 [22 L.Ed. 2d at p. 666].) The crowd laughed at the statement. But a jury convicted the protester of violating a 1917 statute which prohibits any person from "knowingly and willfully . . . [making] any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States . . . ." (18 U.S.C. § 871(a).) The United States Supreme Court reversed with directions to enter an acquittal. Several passages in the opinion are worth noting here. Among other things the court said: "[A] statute such as this one, which makes criminal a form

of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. *What is a threat must be distinguished from what is constitutionally protected speech.* " (*Watts* v. *United States, supra,* at p. 707 [22 L.Ed.2d at p. 667], italics added.) "We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include *vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.*' [Citation.] The language of the political arena, like the language used in labor disputes [citation], is often vituperative, abusive, and inexact." (*Id.,* at p. 708 [22 L.Ed.2d at p. 667], italics added.)

The Legislature's use of the phrase "directly communicated" was designed to distinguish Sunday afternoon soap-box oratory from a threat deliberately calculated to intimidate the recipient. It is one thing to flail the air with rage; it is quite another thing to extort benefits from a public offical or employee.

■ In the case before us there was substantial evidence showing that Zendejas's threat was communicated to Pickering, albeit through intermediaries. The threat was "directly communicated" in the sense that it was unequivocal and directed toward Pickering personally. Perhaps it would have been another matter if Zendejas had threatened to injure all Transit employees generally. But here there was a specific threat to take another man's life. Accordingly we reject Zendejas's first contention.

### III. PERFORMANCE OF DUTY

■ Zendejas next contends that his conduct did not violate Penal Code section 71 because he did not hinder Pickering in the performance of his "public duties." His argument is obscure, but its essence seems to be this: In signing the letter dated May 9, 1985, Pickering was not performing an official duty; therefore, in telling Pickering to abstain from forwarding further letters, Zendejas was not threatening Pickering to refrain from doing "any act in the performance of his duties," within the meaning of the statute.

This argument leaves us gazing into the middle distance. We pause to examine the record in further detail.

Pickering testified that he was the support service manager for the Santa Clara County Transit District. Unquestionably he was a public employee

within the meaning of Penal Code section 71. Pickering further testified: (1) that as support service manager he was the immediate supervisor of the manager of the overhaul and repair department, where Zendejas had last worked; (2) that on May 9, 1985—the date Pickering signed the letter—the manager of overhaul and repair was off duty; (3) that he, Pickering, signed the letter in the absence of the overhaul and repair manager; and (4) that it was in the general nature of his, Pickering's, duties to do so. We have examined the letter itself, and it is obvious that it was typed in preparation for Pickering's signature.

We have quoted pertinent portions of the letter in part I of this opinion, *ante*. There can be no doubt that the letter dealt with official business, viz., Zendejas's medical leave and his claim for workers' compensation. Transit had every legitimate interest in bringing those matters to resolution. Someone in authority had to sign the letter; if the signature were not authentic, the letter would have had no effect. Pickering was authorized to sign, was available to sign, and did so. And while Pickering might not have been engaged in his *normal* duty at the time, it is quite plain that he was engaged in a *legitimate* duty as an employee of Transit.

Penal Code section 71 prohibits dissuading a public employee from doing "any act in the performance of his duties." No qualifying adjective precedes the word "duties." As the California Supreme Court has observed: "A threat of harm to a public officer unless he performs some act *not in his official capacity,* though not extortion, still might amount to an unlawful threat under section 71." (*People* v. *Norris* (1985) 40 Cal.3d 51, 56, fn. 1 [219 Cal.Rptr. 7, 706 P.2d 1141], italics added.)

Accordingly we reject Zendejas's second contention.

## IV. CONSTITUTIONALITY

Finally Zendejas contends that Penal Code section 71 is unconstitutional because it is vague and ambiguous. He quarrels with that portion of the statute which reads ". . . and it reasonably appears to the recipient of the threat that such threat could be carried out . . . ." He argues that "a person charged with [violating] the statute could not know what was in the mind of his victim at the time the threat is received or any time thereafter." He further contends that "the crime cannot be completed, all the elements are not met, until the recipient subjectively believes that the threat can be carried out. This could take minutes, months or years."

This argument falls well wide of the mark. The statute is designed to prohibit *plausible* threats, and to ignore pranks, misunderstandings, and

impossibilities. The statute is designed to deter the culprit who *intends* his threat to be taken seriously. (See *People* v. *Hopkins* (1983) 149 Cal.App.3d 36, 41 [196 Cal.Rptr. 609].) A culprit of sound mind who wants his threat seriously considered will frame the threat in such a way that the recipient will believe it will be carried out. The emphasis is not on the subjective belief of the victim; rather, the emphasis is on the intent of the threatener. For if the victim ignores the first threat, the culprit will threaten again and again. This is the conduct the statute expressly prohibits.

■ "It is an established principle of constitutional law that '. . . a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 491 [134 Cal.Rptr. 630, 556 P.2d 1081].) "By the same token, however, all that is required pertaining to certainty is that the statute be reasonably certain and in accordance with the apparent purpose and intention of the Legislature." (*People* v. *Buice* (1964) 230 Cal.App.2d 324, 336 [40 Cal.Rptr. 877].)

■ We hold that Penal Code section 71 is *not* void for vagueness.

The judgment is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 25, 1988.