[No. H003859. Sixth Dist. Aug. 10, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST LANDRY, Defendant and Appellant.

COUNSEL

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye, David D. Salmon and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AGLIANO, P. J.—

1. *Introduction*

Defendant Ernest Landry appeals from the judgment following a jury verdict finding him guilty of murder. Since the jury did not determine the degree of the murder, defendant is deemed convicted of second degree murder. (§§ 187, 189, 1157; unspecified section references are to the Pen. Code.)

Defendant contends, inter alia, the jury instructions regarding second degree felony murder were erroneously overbroad in not precluding the

jury's use of the wrong underlying felony. We agree and reverse the judgment since it appears defendant was prejudiced by this error.

## 2. *Trial evidence*

Around 10 p.m. on March 28, 1987, Willie Murphy, an apartment manager, left his apartment to investigate what sounded like an automobile accident. He joined Reginald Brown, the assistant apartment manager, and his minor son, on their way to the source of the sound. When the three returned to the apartment complex, defendant, standing with two other men, asked Murphy in a normal tone of voice if the police were out front. Murphy did not respond and kept walking back to his apartment. Defendant sarcastically proclaimed Murphy was the landlord and the police.

Defendant made increasingly angry remarks about Murphy's involvement with defendant's mother. Earlier that month, Murphy had served an eviction notice on defendant's mother. Later defendant had once aimed his hand like a pistol at Murphy.

As Murphy began to climb the stairs to his second-floor apartment, defendant called him "faggot" at least twice. Murphy twice told defendant to stay downstairs. After Murphy reached the second floor, he heard footsteps running up the stairs. Turning, he saw defendant and another man, later identified as Rocky Johnson, ascend the stairs while pulling pistols out of their waistbands. The third man with defendant did not climb the stairs.

Defendant pushed Murphy six feet back against his screen door and repeatedly hit his head with the gun, continuing his verbal abuse for half a minute. Johnson shoved his gun into Murphy's eye and ordered him not to move or he would blow his brains out.

Murphy saw his friend, Reginald Brown, climb the last few stairs and approach from his left. Johnson turned, trained his gun on Brown, and asked him what he intended to do. Brown began to retreat. Johnson killed Brown with one shot to the face. After the shot Johnson and defendant left quickly down the stairs.

The jury was advised defendant had already been convicted (at an earlier trial) of felony assault with a deadly weapon on Murphy due to this incident.

## 3. *Prosecution's theories*

The prosecutor contended defendant was guilty of second degree murder, asserting in opening argument, "There are three distinct legal theories on

[defendant's] responsibility" for the death of Reginald Brown. "The first theory is the just, it's a straight old second degree murder. The second theory is, it is a felony murder. And the third theory is, it's a killing that happens during a conspiracy."

## 4. *Jury instructions*

The jury was asked to decide only whether defendant was guilty or not guilty of second degree murder. The jury was instructed in part as follows. Defendant was "accused of a felony violation of Section 187 of the Penal Code, murder." "In order to prove the commission of the crime of murder, each of the following elements must be proved. One, that a human [being][1] was killed; two, that the killing was unlawful; and three, that the killing was done with malice aforethought or occurred during the commission or attempt to commit a felony inherently dangerous to human life. [¶] Assault with a deadly weapon is a felony inherently dangerous to human life." (Prosecutor's instruction; CALJIC No. 8.10 (1983 rev.).) The elements of assault with a deadly weapon were described. (CALJIC No. 9.02.)

"Malice may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human. [¶] Malice is implied when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [¶] When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought." (CALJIC No. 8.11 (1983 rev.).)

"A conspiracy is an agreement between two or more persons with the specific intent to agree to commit a public offense such as assault with a deadly weapon and with the further specific intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement." The defendant need not have committed the overt act so long as "he was one of the conspirators when such an act was committed." (CALJIC No. 6.10.5 (4th ed. 1979 bound vol.).) "If a number of persons conspire together to commit a felony inherently dangerous to human life, namely, assault with a deadly weapon, and if the life of another person is taken by one or more of them in the prosecution of the common design, and if such killing is done to further that common purpose or is an ordinary and probable result of the

---

[1] We include the bracketed word though it was omitted from the court's reading, since the jury was later given the written instructions.

pursuit of that purpose, all of the coconspirators are deemed in law to be equally guilty of murder of the second degree, whether the killing is intentional, unintentional or accidental." (Prosecutor's instruction; CALJIC No. 8.33 (4th ed. 1979 bound vol.).) Other conspiracy instructions were also given.[2]

"The act of aiding and abetting is a separate and distinct theory of liability from that of conspiracy. A person may aid and abet the commission of a crime, without having previously entered into a conspiracy to commit it. One may be an aider and abettor without being a conspirator." (Prosecutor's instruction.) "A person aids and abets the commission of a crime when he or she, (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging or facilitating the commission of the offense, by act or advice aids, promotes, encourages or instigates the commission of the crime. . . . [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (CALJIC No. 3.01 (1984 rev.).) "[T]hose who aid and abet the commission of the crime" are as guilty as "those who directly and actively commit the act constituting the crime. [¶] One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and probable consequences of any act that he knowingly and intentionally aided or encouraged." (CALJIC No. 3.00 (1987 rev.).) "If a human being is killed by any one of several persons engaged in the perpetration of, or attempt to perpetrate, a felony inherently dangerous to human life, namely assault with a deadly weapon, all persons who either directly and actively commit the act constituting such crime or who with knowledge of the unlawful purpose of the perpetrator of the crime aid and abet in its commission or, whether present or not, who advise and encourage its commission are guilty of murder in the second degree, whether the killing is intentional, unintentional, or accidental." (Prosecutor's instruction; CALJIC No. 8.34 (1974 rev.).)

"No person can be held responsible for a homicide unless the act of killing was either actually or constructively committed by him, that is, it

---

[2] "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy. . . . Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act." (CALJIC No. 6.11.) "Where a conspirator commits an act which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and bound by that act, and no responsibility therefor attaches to any of his confederates." (CALJIC No. 6.16.)

must have been committed by his hand, or by someone acting in concert with him, or in furtherance of a common design or purpose." (Prosecutor's instruction.)

"It is not necessary that all jurors agree in the determination as to which theory or theories of murder have been proven so long as each juror is convinced beyond a reasonable doubt that the defendant is guilty of the crime of murder under any theory defined in these instructions." (Prosecutor's instruction.)

Defendant objected to this last instruction, drawn from *People* v. *Milan* (1973) 9 Cal.3d 185 [107 Cal.Rptr. 68, 507 P.2d 956], and to instructions on second degree felony murder.

5. *Jury deliberations*

The jury began deliberating after lunch on January 6, 1988, and adjourned at 4:30 p.m. They resumed deliberations the next morning. In the early afternoon the jury asked in writing, "The 'malice aforethought' is a charge not understood by the Jury, as stated in the indictment. Instruction 17, item 3 uses additional language—(or occurred during the commission or attempt to commit a felony—). Can we use the additional language in Item 3 to determine our verdict?" After conferring with counsel, the court answered in writing: "Yes. This latter or additional language in Instruction #17 refers to the felony murder rule. It is to be considered along with Instructions #22 and 31. Under this theory of liability the prosecution need not establish 'malice aforethought[.]' [¶] If this response raises further questions, please let me know[.]" Fifteen minutes later, the jury returned its verdict.

6. *Statutory basis of second degree felony murder*

Defendant contends there is no such crime in California as second degree felony murder since it is not proscribed by statute and there is no common law crime in California. (§ 6; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631-632 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

This contention arises from *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], wherein the California Supreme Court labored to establish that first degree felony murder was proscribed by statute, namely section 189 as enacted in 1872.

For our purposes, the operative language in section 187 is, "Murder is the unlawful killing of a human being . . . with malice aforethought" (34

Cal.3d 441, 468), and in section 189 is, "'All murder which is perpetrated by means of a destructive device or explosive, poison, lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree.'" (*Id.* at p. 464, fn. 10.)

*Dillon* acknowledged strong arguments that section 189 is merely degree-fixing and has not preserved statutory text previously codifying the felony-murder rule (34 Cal.3d 441, 465-469), but refuted them as follows. First, involuntary manslaughter was defined in 1872 (and still is) as "'the unlawful killing of a human being *without malice* . . . *in the commission of an unlawful act, not amounting to a felony.'*" (*Id.* at p. 470, fn. 17, italics omitted.) The implication is that an unlawful killing in the commission of a felony was (and is) proscribed elsewhere. (*Id.* at p. 470.) Second, a specific arson murder rule was eliminated from the 1872 Penal Code as surplusage, because arson is one of the felonies named in section 189 as a constituent of first degree murder. (*Id.* at pp. 470-471.) Third and most important, a note by the 1872 Code Commission indicated they believed, albeit erroneously, that the predecessor to section 189 had codified the felony-murder rule for the listed felonies. The Legislature likewise erroneously believed they were codifying the felony-murder rule in enacting section 189. (*Id.* at p. 471.)

*Dillon* concluded, "Accordingly, although the balance remains close, we hold that the evidence of present legislative intent thus identified . . . is sufficient to outweigh the contrary implications of the language of section 189 and its predecessors. We are therefore required to construe section 189 as a statutory enactment of the first degree felony-murder rule in California.[19]" (34 Cal.3d 441, 472.) Footnote 19 states in pertinent part: "We recognize that from the standpoint of consistency the outcome of this analysis leaves much to be desired. Although the misdemeanor-manslaughter rule is plainly a creature of statute (Pen. Code, § 192, par. 2), we reach the same conclusion as to the first degree felony-murder rule only by piling inference on inference; and the second degree felony-murder rule remains, as it has been since 1872, a judge-made doctrine without any express basis in the Penal Code (see *People* v. *Phillips* (1966) . . . 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353], and cases cited). A thorough legislative reconsideration of the whole subject would seem to be in order."

This comment in *Dillon* on second degree felony murder is dictum, because the defendant there was convicted of first degree felony murder. The court reduced his conviction to second degree murder, reasoning that any

greater punishment was unconstitutionally cruel and unusual. (34 Cal.3d 441, 477-489.)

*People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894] paraphrased this comment in *Dillon,* calling the second degree felony-murder rule "a creature of judicial invention." (*Id.* at p. 829, fn. 3.) *Burroughs* declined to reconsider the continuing vitality of this rule, though the defendant stood convicted of that crime, because the issue had not been raised. (*Ibid.*) Instead, the court reversed the conviction because the felony of unlicensed practice of medicine is not inherently dangerous to human life. (*Id.* at pp. 829-833.)

Neither *Dillon* nor the majority opinion in *Burroughs* acknowledged the earlier holding in *People* v. *Taylor* (1980) 112 Cal.App.3d 348 [169 Cal.Rptr. 290], that section 189 proscribes second degree felony murder. ■ We are not required to follow holdings by other district Courts of Appeal, though we ordinarily do so without good reason to disagree. (*Greyhound Lines, Inc.* v. *County of Santa Clara* (1986) 187 Cal.App.3d 480, 485 [231 Cal.Rptr. 702].)

We find an answer provided by *People* v. *Phillips, supra,* 64 Cal.2d 574, upon which *Taylor, supra,* 112 Cal.App.3d 348, 356, also relied. ■ *Phillips* states: "Despite defendant's contention that the Penal Code does not expressly set forth any provision for second degree felony murder and that, therefore, we should not follow any such doctrine here, the concept lies imbedded in our law. We have stated in *People* v. *Williams* (1965) 63 Cal.2d 452 . . . , that the cases hold that the perpetration of some felonies, exclusive of those enumerated in Penal Code section 189, may provide the basis for a murder conviction under the felony-murder rule. [Citation.] [¶] We have held, however, that only such felonies as are in themselves 'inherently dangerous to human life' can support the application of the felony-murder rule. We have ruled that in assessing such peril to human life inherent in any given felony 'we look to the elements of the felony in the abstract, not the particular "facts" of the case.' (*People* v. *Williams, supra,* 63 Cal.2d 452, 458, fn. 5.)" (64 Cal.2d at p. 582.)[3] The court in *Phillips* went on to reverse the conviction because the underlying felony of grand theft was not inherently dangerous to human life. (*Id.* at pp. 583-586.)

■ Lower courts are bound by the Supreme Court's holdings. (*People* v. *Triggs* (1973) 8 Cal.3d 884, 890-891 [106 Cal.Rptr. 408, 506 P.2d 232] (disapproved on another ground in *People* v. *Lilienthal* (1978) 22 Cal.3d

---

[3] Currently pending before the California Supreme Court is a case posing the question whether this test should be refined. (*People* v. *Patterson* ■ Cal.App.)

891, 896, fn. 4 [150 Cal.Rptr. 910, 587 P.2d 706]); *People* v. *Zendejas* (1987) 196 Cal.App.3d 367, 375 [241 Cal.Rptr. 715].) We are compelled to conclude the statutes do prohibit as second degree murder an unlawful killing committed in the perpetration or attempted perpetration of a nonenumerated felony inherently dangerous to human life.

## 7. *Felony integral to homicide*

■ Defendant alternatively asserts the felony-murder instructions were erroneous for not applying the doctrine of merger of the underlying felony and the homicide.

*People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] adopted the merger doctrine as follows. "[A] second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence . . . shows to be an offense included *in fact* within the offense charged. [Fn. omitted.]" (*Id.* at p. 539, italics in original.) The jury there was instructed erroneously that it was second degree murder if an unlawful killing resulted from attempted or actual perpetration of an inherently dangerous felony such as assault with a deadly weapon. (*Id.* at p. 538.) The evidence showed the only assault with a deadly weapon resulted in death. (*Id.* at pp. 527-528.)

In *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847], the merger doctrine was applied where the defendant had entered a house and attacked his wife and her daughter with an iron bar, killing the daughter. The jury was instructed on felony murder in connection with a burglary and the prosecution urged the specific intent of the burglary was intent to assault. (*Id.* at pp. 184-185.) In response to a question by the jury, the court instructed them the felony-murder rule applied if the defendant had a specific intent to assault upon entering the residence. (*Id.* at p. 185.)

The court found the felony-murder instructions improper under *Ireland,* reasoning as follows. "The Attorney General, pointing out that there is evidence from which the jury might have concluded that defendant entered with intent to assault his wife with a deadly weapon but not his stepdaughter, urges that the felony-murder rule is applicable on the theory that the burglary based on the intent to assault the wife was independent of and collateral to the killing of the stepdaughter. It may be noted in this connection that in New York it has been held that, although the felony-murder rule does not apply where a defendant intentionally assaults each of his two victims who die as a result of the assaults, the rule is applicable if the defendant assaulted one person but killed another who came to the first's

defense. [Citations.] [¶] However, the instructions given to the jury did not posit the applicability of the felony-murder rule upon any such theory. Moreover, we are satisfied that the distinction made by the New York cases is untenable in the light of ordinary principles of culpability. It would be anomalous to place the person who intends to attack one person and in the course of the assault kills another inadvertently or in the heat of battle in a worse position than the person who from the outset intended to attack both persons and killed one or both." (2 Cal.3d 180, 188-189.) The doctrine of transferred intent, not felony murder, is appropriate on such facts. (*Id.* at p. 189.)

There was evidence here of three assaults with a deadly weapon, namely defendant on Murphy, Johnson on Murphy, and Johnson on Brown. Under *Sears,* defendant argues alternatively all assaults were integral to the killing of Brown or the jury was not given an instruction precluding their use of the assault on Brown as the felony underlying felony murder.

The People correctly point out the quoted portion of *Sears* is not controlling precedent because it does not represent a majority opinion. (*People* v. *Ceballos* (1974) 12 Cal.3d 470, 483 [116 Cal.Rptr. 233, 526 P.2d 241]; *People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].) This portion of *Sears* was quoted in *People* v. *Smith* (1984) 35 Cal.3d 798, 804-805 [201 Cal.Rptr. 311, 678 P.2d 886], but the quotation was merely an illustration of the development of merger doctrine and is dictum.

The People also rely on *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]. As explained in *Smith, supra,* 35 Cal.3d 798, 805-806: "In *People* v. *Burton, supra,* [the Supreme Court] refined the *Ireland* rule by adding the caveat that the felony-murder doctrine may nevertheless apply if the underlying offense was committed with an 'independent felonious purpose.' (6 Cal.3d at p. 387.) Even if the felony was included within the facts of the homicide and was integral thereto, a further inquiry is required to determine if the homicide resulted 'from conduct for an independent felonious purpose' as opposed to a 'single course of conduct with a single purpose' (*ibid.*)."

The People assert that the *Burton* caveat has revived the applicability of the felony-murder rule "when a felon assaults one person with a deadly weapon and when the felon or an accomplice kills another person attempting to come to the aid of the first victim." We need not determine whether the jury might have been able to convict defendant of second degree felony murder upon finding an independent felonious purpose to the pistol-whipping of Murphy. The jury was not so instructed. There was *Ireland* error in

that the jury was not instructed it could not rely on the assault on Brown to apply the felony-murder rule.

### 8. *Prejudice*

██ Defendant asserts he was prejudiced by the court's second degree felony-murder instructions because we cannot determine on appeal whether the jury relied on a proper or improper felony-murder theory to convict him.

The People concede, as they must, "The record shows that the jury may well have relied on a felony murder theory in reaching its verdict of guilt." However, they assert that any error in the felony-murder instructions was harmless beyond a reasonable doubt because any properly instructed reasonable jury would have convicted defendant on an aiding and abetting theory explained below.

Defendant recognizes that *People* v. *Lee* (1987) 43 Cal.3d 666 [238 Cal.Rptr. 406, 738 P.2d 752] rejected an argument similar to his own as follows. "[D]efendant relies on cases holding that a conviction should be reversed if the jury instructions regarding one of several prosecution theories were legally or factually incorrect, and it is impossible to determine which theory the jury relied on in rendering its verdict. (E.g., *People* v. *Green* (1980) 27 Cal.3d 1, 69-70 . . . .) But, assuming that it is clear beyond a reasonable doubt that a properly instructed jury would have found a specific intent to kill, any error in instructing the jury on the alternative 'theory' of implied malice cannot be deemed a 'miscarriage of justice' under our state constitutional harmless error provision (art. VI, § 13), and a reversal-per-se rule would be inappropriate. [Citation.]" (43 Cal.3d 666, 675, fn. 1.)

This footnote is confusing in blending the federal and state tests for prejudice. (See *People* v. *Leffel* (1988) 203 Cal.App.3d 575, 585-586 [249 Cal.Rptr. 906].) It seems to shift the concern from whether the jury was actually misled to whether there was evidence to uphold a conviction under a viable theory. A close reading of the case clarifies the confusion.

*Lee* carefully considered the proper test for prejudice when conflicting instructions were given regarding specific intent to kill in an attempted murder. The court concluded that such conflicting instructions were an error akin to removing the issue of intent from the jury. (43 Cal.3d 666, 674.) Even so, the court, relying on *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]; and *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918] further concluded that, so long as the jury was

not completely misinstructed on the issue, such an error could be harmless beyond a reasonable doubt and was not reversible per se. (43 Cal.3d at pp. 674-676.) The court concluded the defendant was not prejudiced by the contradictory instructions, reasoning as follows. First, the jury was not actually misled because correct instructions were given and argued to the jury. (*Id.* at pp. 677-678.) Second, proper instructions would have yielded the same result due to strong evidence of intent to kill. (*Id.* at p. 679.)

*People* v. *Dyer* (1988) 45 Cal.3d 26 [246 Cal.Rptr. 209, 753 P.2d 1], has subsequently clarified how to evaluate *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] error in aiding and abetting instructions. The court determined the erroneous instructions did not entirely preclude the jury from considering the defendant's intent. (45 Cal.3d at pp. 62-64.) Thus, such an error could be harmless beyond a reasonable doubt. (*Id.* at p. 64.) The court found the error harmless based on the evidence showing the defendant intended to kill both murder victims and both attempted murder victims. (*Id.* at p. 65; accord *People* v. *Walker* (1988) 47 Cal.3d 605, 632-633 [253 Cal.Rptr. 863, 765 P.2d 70].)

■ It appears from these authorities that the test for prejudice resulting from instructional error, at least regarding elements of the offense, is now whether the evidence eliminates any reasonable doubt that a defendant would have been convicted under proper instructions. (But see *People* v. *Jones* (1989) 207 Cal.App.3d 1090, 1097-1098 [255 Cal.Rptr. 464].)

■ Eschewing other theories of liability, the People contend a properly instructed jury would convict defendant on the following aiding and abetting theory. Defendant aided and abetted Johnson's assault on Murphy with the intent to aid that assault and Brown's death was a reasonably foreseeable consequence of that assault. The People assert, "there could be no doubt that a reasonable jury, if correctly instructed, would have found it reasonably foreseeable to [defendant] that a bystander might come to the aid of a victim literally under the gun and that the felon's armed accomplice might well shoot that person."

The very statement of this contention undermines it. As the jury was instructed, an aider and abettor is liable not only for the planned offense, but also "for the natural and probable consequences of any act" aided and abetted. (CALJIC No. 3.02; cf. *Jones, supra,* 207 Cal.App.3d 1090, 1095, and cases there cited.) We cannot say it is more likely than not either that a bystander would attempt to rescue the victim of an armed assault or that the bystander would be shot in such attempt, particularly while retreating. While such reactions were possible, they were not, as a matter of law, the natural and probable consequences of the assault on Murphy. Therefore, we

are unable to conclude the error in not limiting the second degree felony-murder instructions was harmless beyond a reasonable doubt.

In view of our conclusion, we do not resolve defendant's other contentions, including whether the court had jurisdiction to convict him of felony murder when only murder was charged (see *People* v. *Watkins* (1987) 195 Cal.App.3d 258, 267 [240 Cal.Rptr. 626]), and whether the court erred in instructing the jury they could choose different theories of liability or about defendant's potential liability for acting in concert.

9. *Disposition*

The judgment is reversed.

Cottle, J., and Elia, J., concurred.