[No. B124801. Second Dist., Div. One. Oct. 28, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JONATHAN NORMAN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through V.

## COUNSEL

Beck, De Corso, Daly Barrera & Kreindler, Anthony A. De Corso and Charles L. Kreindler for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Kenneth C. Byrne and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**VOGEL (Miriam A.), J.**—Jonathan Norman was convicted of stalking, with allegations that he had suffered two prior strikes and served one prior prison term found true. In the published portion of this opinion, we reject Norman's contention that, to constitute stalking in violation of Penal Code

section 646.9, the victim's fear must be contemporaneous with the stalker's threats and harassment.[1] In the unpublished portion of this opinion, we reject Norman's remaining claims of error.

FACTS

On June 23, 1997, Steven Spielberg (the victim) left his Pacific Palisades residence and flew to Ireland, where he was joined by his wife and children. On June 29, Norman drove a rented Jeep Cherokee to Spielberg's residence and pushed the intercom button at the gate. When Steven Lopez (a security guard) came to the gate, Norman said he worked for Spielberg's partner, David Geffen, and demanded to see Spielberg. Lopez knew the Spielbergs were out of town and told Norman to leave. Norman glared at Lopez, then left. Several days later, Norman drove a friend (Charles Markovich) by Spielberg's home, opened his "day planner" and showed Markovich a photograph of Spielberg's head affixed to a photo of a naked male body. On July 9, Norman told Markovich that he was going to climb over the wall at Spielberg's residence and rape him.

About 1:25 a.m. on July 11, a Westec security officer (William Hunter) noticed a Land Rover parked in an odd position across the street from Spielberg's residence. Norman, who had replaced the rented Jeep with the rented Land Rover, was sitting behind the wheel. When Hunter rejected Norman's tale of engine problems and told Norman to leave, Norman complied. A few hours later (about 7:00 a.m.), Westec responded to several calls reporting a man in the backyards of the homes near Spielberg's residence. One of the officers (Manuel Hernandez) saw Norman, five-foot stick in hand, running over lawns and jumping fences. Hernandez gave chase and found Norman hiding under some bushes. When Norman raised his hands in response to a command from Hernandez, Norman dropped his day planner, revealing cut-out photographs of Spielberg. Norman told Hernandez he was "running away from the jackal" and also said he was Spielberg's "newly-adopted son." The police arrived and took custody of Norman. When he was interviewed by the police, Norman identified himself as "David Spielberg" and explained that he had been chased by "jackals," ferocious dogs owned by Spielberg. Norman was released about 10:30 a.m.

About 5:10 p.m., Norman returned to Spielberg's residence and parked the Land Rover about 100 feet from Spielberg's driveway, directly in front of Lopez's car. About 20 minutes later, Lopez saw the Land Rover, recognized Norman, called another security officer and told him to call the police. As Lopez watched, Norman backed the Land Rover into the driveway and up

---

[1]Undesignated section references are to the Penal Code.

to the gate as though he was trying to push it open, then drove away. When the police arrived, they found Norman's unoccupied car parked about two blocks from Spielberg's residence. The officers waited until Norman returned, detained him and searched him, finding handcuffs, a box cutter and duct tape on his person and, in his briefcase, two pairs of handcuffs, a day planner with photos of Spielberg, and parking tickets issued for both the Jeep and the Land Rover. Razor blades were found in the car. When asked what he was doing in the area, Norman said he had an appointment with Spielberg about a screenplay that involved one man raping another man, and that the handcuffs and tape were props. No screenplay was found in the car. Norman was placed on a 72-hour hold (which was later extended).

On July 14, a security agent notified Spielberg's lawyer, Bruce Ramer, about the events of June 29 and July 11. On July 17, Norman was released from custody and Ramer was notified. Ramer, in turn, contacted Spielberg in Ireland and told him about Norman's conduct. Ramer also told Spielberg that Norman had the names of Spielberg's wife and children in his day planner, that he had been carrying handcuffs, duct tape and a box cutter, and that Norman had a record of prior assaultive conduct. Spielberg, afraid for his family and for himself, authorized additional security measures at the Pacific Palisades house, for his mother's Los Angeles residence, and for himself and his family in Ireland and later in England.

On July 18, Norman was arrested on an unrelated parole violation. On July 21 (and again on August 4), he confessed to the police that he had gone to Spielberg's home on the night of July 11, intending to rape Spielberg and that, for weeks before that night, had been sexually attracted to and obsessed with Spielberg. Norman explained that he had conducted research to learn all he could about Spielberg, that he had purchased the handcuffs and duct tape for use in his planned rape, and that he had attempted to jump Spielberg's fence but had been chased away by Spielberg's dogs. On July 23, Norman confessed to Rick Vigil, the person in charge of Spielberg's security, confirming the statements he had made to the police and explaining that, had he gained entry and had Spielberg's wife been present, he planned to "tie her up and make her watch" while he raped Spielberg. On July 29, Ramer told Spielberg about Norman's plan to rape him. Spielberg, concerned that Norman might be released from custody, kept the increased security arrangements in place.

In Norman's personal effects, the police found a notebook of his writings (Norman wrote about "pursuing Mr. Spielberg to become one of his gay lovers," with details about some of the specific things he wanted to do to Spielberg), a map of movie stars' homes with Spielberg's name and address

marked in ink, articles about Spielberg, and documents listing the names and other information about various members of the Spielberg family (his sisters, children, wife, former wife, and mother). There were more razors. There was an article chronicling the stalking conduct of John Lennon's killer.

By indictment, Norman was charged with one count of stalking (§ 646.9, subd. (a)), with allegations that he had suffered two prior serious felony convictions (both in 1995, both for assault with a deadly weapon) and served one prior prison term. At trial, the People presented evidence of the facts summarized above. In addition, Spielberg testified that he was still afraid of Norman and believed he was the object of a "mission" that Norman was capable of carrying out. The jury rejected Norman's defense (he claimed his heavy drug use precluded a finding that he had the requisite intent) and convicted Norman of stalking. The allegations were found true, and Norman was sentenced to state prison for a term of 25 years to life. He appeals.

## DISCUSSION

### I.

Norman contends that, to be punishable under section 646.9, the stalking or other harassment must contemporaneously cause fear. We disagree.

### A.

As relevant, the current version of section 646.9 provides:

"(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(e) For the purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. *This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person.*

"(f) For purposes of this section, 'course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short,

evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'·

"(g) For the purposes of this section, 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and *conduct made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family.* It is not necessary to prove that the defendant had the intent to actually carry out the threat. The present incarceration of a person making the threat shall not be a bar to prosecution under this section.

"(h) For purposes of this section, the term 'electronic communication device' includes, but is not limited to, telephones, cellular phones, computers, video recorders, fax machines, or pagers. . . ." (Italics added.)[2]

B.

To state the obvious, there is nothing in the language of the statute to require a concurrence of act and reaction. By its plain terms, all that is required for a conviction under section 646.9 is proof that the defendant, (1) with the apparent ability to carry out his threat, (2) has willfully, maliciously and repeatedly harassed his victim (3) with the intent to place the victim in reasonable fear for his safety and (4) has, in fact, caused his victim to reasonably fear for his safety or the safety of his family. (§ 646.9, subds. (a), (e), (g).) Indeed, by its current provision that stalking can occur by the use of an "electronic communication device," including a computer, the statute necessarily encompasses situations where there is a delay between the defendant's harassment and his victim's awareness of the defendant's conduct. (§ 646.9, subds. (g), (h).) By way of simplistic example, a threat communicated by e-mail may not be received for hours or days or even weeks (depending upon the frequency with which the recipient checks his

---

[2]Those portions of subdivisions (g) and (h) that refer to threats made by means of an electronic communication device ("cyber-stalking") were added to the statute in 1998, after Norman's crime was committed, and are referred to this opinion solely to show the Legislature's confirmation of the meaning we give to the language that existed in 1997. (Stats. 1998, ch. 825, § 4; Stats. 1998, ch. 826, § 1; and see *People* v. *Williams* (1991) 232 Cal.App.3d 1643, 1647 [284 Cal.Rptr. 241] [failure to make changes in a statute in a particular respect when the subject is before the Legislature and changes are made in other respects indicates an intention to leave the law unchanged in that respect].)

e-mail)—in which event the victim's fear, on reading the e-mail, would occur hours or days or weeks after the threat was made. Since the statute was not otherwise amended when the cyber-stalking provisions were added, logic dictates that the result must be the same here, and that Spielberg's serendipitous absence on the days of Norman's efforts to gain access to Spielberg's residence cannot diminish Norman's criminal responsibility for his course of conduct. What matters is that, when he did learn of Norman's acts and threats, Spielberg suffered the requisite fear for his own safety and the safety of his family. (*People* v. *Loeun* (1997) 17 Cal.4th 1, 8 [69 Cal.Rptr.2d 776, 947 P.2d 1313] [in construing the relevant provisions of a statute, we strive to ascertain and effectuate the Legislature's intent].)

## C.

In *People* v. *Falck* (1997) 52 Cal.App.4th 287, 298 [60 Cal.Rptr.2d 624], and *People* v. *Heilman* (1994) 25 Cal.App.4th 391, 394 [30 Cal.Rptr.2d 422], each defendant's course of conduct included threats communicated by letters (and, in *Falck,* by black roses delivered by someone other than the defendant). In *People* v. *Kelley* (1997) 52 Cal.App.4th 568, 573, 577-578 [60 Cal.Rptr.2d 653], *People* v. *Halgren* (1996) 52 Cal.App.4th 1223, 1227 [61 Cal.Rptr.2d 176], *People* v. *McCray* (1997) 58 Cal.App.4th 159, 163 [67 Cal.Rptr.2d 872], and *People* v. *Carron* (1995) 37 Cal.App.4th 1230, 1234 [44 Cal.Rptr.2d 328], each defendant's course of conduct included threatening messages left on the victims' answering machines. In all of these cases (and they were all decided before the 1998 amendment to the statute), the victim's awareness of the threatening letters and messages necessarily occurred after the letters were sent and the messages recorded, yet none of the convictions were found wanting on this basis. In all of these cases, it would have been irrelevant if the victims had been out of the country at the time the letters were sent or the messages recorded. Although there are no published opinions in which the precise issue raised by Norman has been considered, we find it persuasive that everyone except Norman seems to assume the obvious—that the Legislature's failure to include in the statute words that would require that the cause be contemporaneous with the effect means that there is no such requirement.[3]

---

[3]Similar statutes have received a similar interpretation. For example, in *In re David L.* (1991) 234 Cal.App.3d 1655, 1658-1659 [286 Cal.Rptr. 398], the court considered section 422, which, at that time, provided that: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person

## D.

Accordingly, while we agree with Norman that the victim must become aware of the stalker's conduct—because, without awareness, the victim could not suffer the emotional distress that is an element of the crime (§ 646.9, subd. (e))—we do not agree that the awareness must be contemporaneous with the course of conduct that constitutes the stalking (§ 646.9, subd. (a)).[4]

## II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ." *David L.* explains that section 422 "does not in terms apply only to threats made by the threatener personally to the victim nor is such a limitation reasonably inferable from its language. The kind of threat contemplated by section 422 may as readily be conveyed by the threatener through a third party as personally to the intended victim." (*In re David L., supra,* 234 Cal.App.3d at p. 1659.) Indeed, even where, as in section 71, the statute prohibits threats "directly communicated" to a public officer or employee, the statute is satisfied when a message is left on an answering machine or relayed by a third person. (*People* v. *Zendejas* (1987) 196 Cal.App.3d 367, 374-377 [241 Cal.Rptr. 715]; see also Code Civ. Proc., § 527.8; Civ. Code, § 1708.7.)

[4]We summarily reject Norman's claims of insufficient evidence, most of which assume acceptance of the notion that Spielberg's absence from the country made his fear unreasonable or Norman's threats not credible. Spielberg testified that he feared for his safety and that of his family members. He testified about the arrangements he made for increased security for himself, his wife and children while they were abroad, and for his mother here in California. Other evidence established Norman's visits to the Spielberg residence, his attempted climb over the wall, and his other bizarre behavior, including his visits to Spielberg's residence, his lies about his employment and his relationship to Spielberg, and his other threatening acts and statements of intent. The fact that Spielberg learned about Norman's threatening conduct from Ramer is irrelevant—it was Norman whose course of conduct, as fully described above, was threatening and which created a foreseeable need to inform Spielberg of the danger. The fact that Norman was incarcerated at the time he confessed is similarly irrelevant, and the evidence presented to show that Norman's obsession continued during incarceration was properly admitted. (§ 646.9, subd. (g) [the present incarceration of a person making the threat shall not be a bar to prosecution under this section]; Evid. Code, § 352; *People* v. *Barnett* (1998) 17 Cal.4th 1044, 1118-1119 [74 Cal.Rptr.2d 121, 954 P.2d 384].) The jury found that Norman's course of conduct did pose a credible threat, that Spielberg's fear was reasonable, and that the other elements of this crime were proved. The jury's conclusion is supported by substantial evidence, and no more was required.

At oral argument, Norman's appellate counsel claimed, for the first time, that the indictment failed to adequately inform Norman of the charges against him because, according to counsel, it did not allege the date on which Spielberg suffered the requisite emotional distress. The issue was waived by Norman's failure to raise it in his briefs. (*Bonshire* v. *Thompson* (1997) 52 Cal.App.4th 803, 808, fn. 1 [60 Cal.Rptr.2d 716].)

*See footnote, *ante,* page 1234.

## DISPOSITION

The judgment is affirmed.

Ortega, Acting P. J., and Masterson, J., concurred.

A petition for a rehearing was denied November 19, 1999, and appellant's petition for review by the Supreme Court was denied January 25, 2000.