Filed 8/16/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | B327891 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. YA104659-01 |
| v. | |
| KURT BRADY OBERMUELLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Nicole C. Bershon, Judge. Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Lauren N. Gruber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kurt Brady Obermueller appeals his second stalking conviction on the ground the court should have instructed the jury on a lesser included offense: *attempted* stalking. His logic is that, after his first conviction, he refrained from emailing directly to the victim herself. Rather, he emailed threatening messages only to her *family*, who forwarded the messages to the victim. We affirm because stalkers who recklessly intend to threaten a victim incur full liability under the stalking statute, no matter how they do it. The statute requires the defendant to "make a credible threat." (Pen. Code, § 646.9, subd. (a).) Left open is *how* the defendant conveys this threat. Stalkers can be imaginative. Obermueller used intermediaries to make credible threats against his victim, and that was completed stalking, not attempted stalking. The trial court thus properly declined to instruct on attempted stalking because no substantial evidence supported the lesser included offense. (See *People v. Williams* (2015) 61 Cal.4th 1244, 1263 (*Williams*).) All code citations are to the Penal Code.

## I

Obermueller's girlfriend rejected him in ninth grade. Thirty years later, he began stalking her. His goal was to get his high school prom kiss.

## A

Obermueller grew up in a small town near Sacramento. He was in a brief relationship with schoolmate Kathy K. in junior high school. Kathy K. lived with her father Bill and her older sister Jennifer. Kathy K. later married Matthew B. and went by Kathy B., which is how we refer to her.

Kathy B. ended her relationship with Obermueller when she was 15. The relationship had not been happy for Kathy B.;

2

"it has always been a difficult memory and something I always wished had not happened." Once in high school, "I wasn't interested in him at all."

She attended her high school prom with someone else. She had ended her relationship with Obermueller years earlier.

Kathy B. went to college, moved with her family to Southern California, and married Matthew B. The couple had children and lived in Manhattan Beach.

Obermueller remained six hours away in the Sacramento area. Obermueller and Kathy B. had no contact during the next 30 years.

Kathy B. and her husband raised their children in Manhattan Beach. She pursued her interest in art, selling her oil paintings at the annual art fair in Manhattan Beach.

Kathy B. also created her own website to display and market her art. On this website, Kathy B. used "my first name, my maiden name, and my last name which was a big mistake." It was a "big mistake," she concluded, because it made her "too easy to find."

## B

In the summer of 2018, when he was in his 40s, Obermueller contacted Kathy B. through her website. He emailed her, claiming he wanted to buy a painting. She responded in an open and innocent way, believing they were just friends becoming reacquainted.

"It didn't take very many emails back and forth before he started bringing up our relationship from the past. . . . I told him I wasn't interested in talking about that. But then the emails would start to get inappropriate and sexual and I told him to stop contacting me at that point."

Obermueller briefly stopped emailing Kathy B.

C

In late 2018 or early 2019, Obermueller resumed and intensified his contact with Kathy B. Over the next two years, Obermueller sent her an avalanche of sexually-charged and threatening emails, texts, and online communications. He also sent messages to her father and sister, who forwarded the messages to her.

Obermueller posted publicly about Kathy B. on a website he created. Kathy B. described Obermueller's website: "It was all about me and all the reasons I should be his wife."

Obermueller discovered Kathy B.'s home address. He sent flowers and a spa certificate to her house.

Obermueller's prolonged and relentless persistence greatly distressed Kathy B. Her hair began to fall out, and she gained weight. She experienced panic attacks. She and her husband installed cameras around their home.

On October 1, 2019, Obermueller emailed Kathy B. "I need you Kathy. Cum in you . . . Tell me to stop." This message was "especially scary" to Kathy B. "That was the week I went to the police."

A few days later, Obermueller traveled some 400 miles to see Kathy B., in person and by surprise. He went to the Manhattan Beach art fair where Kathy B. sold art. Obermueller walked up and said, "Hi, Kathy." Kathy B. panicked and ran for police, but Obermueller disappeared before they could respond.

Later that day, Obermueller sent Kathy B. a message saying, "You think a restraining order is going to stop me from hugging my princess bride baby." Another message said, "When are you going to understand that nothing can stop true love.

4

Manhattan Beach Police Department step aside …. I just want to hug her one last time."

Kathy B. got a restraining order against Obermueller that issued on October 24, 2019. Kathy B. had applied for coverage for her father and sister as well as her immediate family, "but the judge crossed their names out" because "they don't live with you so they can't -- they have to come get their own." As issued, then, and as served on Obermueller, the 2019 restraining order showed the court had crossed out the names of Kathy B.'s father and sister. This fact will assume significance.

D

In early 2021, prosecutors charged Obermueller with stalking Kathy B. She testified as part of that prosecution. When she was on the witness stand, with Obermueller in the room, Kathy B. said her father and sister had forwarded to her all of the emails Obermueller had sent to them.

Obermueller concluded that case by pleading no contest to a charge of stalking Kathy B. Part of the case resolution was a criminal protective order dated January 6, 2021 against contacting Kathy B. "directly or indirectly." Obermueller was served with this order in open court.

E

After his January 2021 conviction, despite the criminal protective order, and in violation of his probation, Obermueller continued harassing Kathy B. Now, however, he emailed only her father and sister, who had their own law firm. Her father and sister forwarded Obermueller's emails to Kathy B. We describe some of these emails.

In April 2021, Obermueller sent a long and rambling email to Kathy B.'s father and sister. The jury saw this email as

5

Exhibit 20, which consisted of *40 pages* of comments about Kathy B., disconnected musings, opaque remarks about taser darts, and disturbing imagery. We excerpt portions of this stream of consciousness without correcting spelling, punctuation, or grammar.

Obermueller wrote that Kathy B. "still owes me my prom kiss and [her husband] can keep her. She totally lead me on and now my boy cat is gone now. . . . [¶] Anyway long story sorry I have to declare war on you all and I will seriously take you all down one by one. . . ."

This sentence made Kathy B. frightened for the safety of herself and her family. "That was really scary."

Obermueller's email continued. "My payback to her for killing my boy cat will be the way I kiss her and leave. My kiss will weaken her knees and she'll get lost in it. Then I'll look deep in her brown eyes and then.......wait......then I'll go. [¶] She will learn what she missed out on with one kiss. She think about that kiss for the rest of her life. [¶] And her husband will know and he can't do a dam thing about it."

"I got an RO [restraining order] from her but her father and sister opted out. . . ."

"Thanks folks I'm taking no prisoners."

"Those scissors are used for removing clothing from patients 'suffering TRAUMA.' [¶] Chunks of flesh missing. Large gashes severe blood loss ...etc etc... 'trauma.' . . . You're jealous of my custom made hand stitched (it's a weapon) sheath. . . . Your talking to a guy that makes his own sheath for this fabric scissors. . . . Not even with my (the best you can get) forged emorders [*sic*] scissors. Those scissors cut clean, Made in Germany."

This email also described Obermueller's method for sharpening scissors and knives. "All my knifes are wicked sharp."

Kathy B. testified that, in this email from Obermueller, "anything with some sort of weapon or violence was really terrifying."

Another Obermueller email was Exhibit 21 at trial. This exhibit was 34 pages long. Again we excerpt.

This email repeatedly refers to "Kathy," her paintings, and her art website. It also refers to Kathy B.'s husband as "the hackers spouse." Obermueller wrote that his last email "is on an indirect online communication relationship thing with the girl from my past -- the hackers spouse."

"Kurt Brady Obermueller it's LIVE FREE OR DIE! . . . AK-47 w/2000 rounds of 7.62x39 COME GET SOME!"

In other portions of this lengthy email, Obermueller repeated his reference to an AK-47 and to the 2000 rounds of ammunition. Obermueller also mentioned "a German WW2 Lugger." Presumably this refers to a Luger pistol. Obermueller included a picture of a gun in this email.

"The point is RO [restraining orders] don't really protect women. . . . It's Live Free or Die."

Kathy B. testified this email "terrified" her. It made her consider uprooting her family and moving far away.

In May 2021, Obermueller again emailed Kathy B.'s father and sister. This email was Exhibit 22. Obermueller wrote, "Hi Jennifer, [¶] So you and your father get the luxury of opting out of her RO . . . ."

In this email, Obermueller refers to "Kathy" and then mentions "Sampson," "Rocky," and "Andy."

Kathy B. testified her childhood pets had these names. "Sampson was the cat and Rocky and Andy were the dogs."

Obermueller wrote " 'Snap!' [¶] I break Andy's neck and drop his dead body on the ground like dropping the mic and walk out. . . . On my way out I step on Rocky's back leg and break it."

A woman renting a room in Obermueller's Northern California house around this time said Obermueller claimed he was sewing a duffel bag "to bring his girlfriend back and her belongings." "Like if she wanted to come or not, you know, he's going to bring her here because he's in love with her." The woman remembered this conversation because it made her uncomfortable.

Police searched Obermueller's home on April 13, 2021 and seized several journals. Obermueller's handwritten journals detail his plans for meeting with Kathy B. "I kiss her left ear. I whisper I love you." Another passage predicted Kathy B.'s husband "will become a faded memory. Kathy's kids will be my kids . . . ." A May 1, 2021 entry stated, "I want to see Kathy once and for all face to face alone and in private. I'm getting my prom kiss and that's final."

F

On August 12, 2022, an information charged Obermueller with stalking with a prior felony conviction for stalking (§ 646.9, subd. (a)) and disobeying a court order (§166.9, subd. (a)(4)). The alleged dates of the stalking were from April 1, 2021 to May 31, 2021. The case went to trial in October 2022. The jury convicted Obermueller on both counts. The trial court sentenced him to five years in custody.

8

## II

Obermueller incorrectly claims the trial court should have instructed the jury on the lesser included offense of attempted stalking. This kind of claim requires Obermueller to identify evidence that would have permitted conviction on the lesser offense but would *not* have allowed conviction on the greater charge. Obermueller fails in this quest. He argues his decision to email only Kathy B.'s father and sister, and to steer clear of emailing Kathy B. directly, could have supported a conviction for attempted stalking alone. But *how* a stalker proceeds does not matter, so long as the prosecution proves the stalker made "a credible threat with the intent to place that person in reasonable fear . . . ." (§ 646.9, subd. (a).) Threats conveyed only by messengers can be fully effective in terrorizing a target, as they were in this case. Obermueller's tactic of confining his emails to Kathy B.'s father and sister was legally irrelevant so long as it was clear, as it was here, that Obermueller was recklessly aware of his statement's threatening character. The lesser included offense instruction was irrelevant. The trial judge was right not to give it.

## A

We summarize some law.

Trial courts must instruct on general legal principles closely related to the case, including necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. But the existence of any evidence, no matter how weak, will not justify instructions on a lesser included offense, for such instructions are required only where there is substantial evidence from which a rational jury could conclude that the defendant committed the lesser offense

9

*but not the greater offense.* (*Williams, supra*, 61 Cal.4th at p. 1263.) We independently review this issue. (*People v. Simon* (2016) 1 Cal.5th 98, 133.)

We excerpt the stalking statute, adding bracketed numbers, italics, and formatting for clarity.

"Any person who

[1] willfully, maliciously, and repeatedly follows or willfully and maliciously *harasses* another person

and

[2] who *makes a credible threat with the intent* to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . . (§ 646.9, subd. (a).)

The statute defines *harasses* as follows: " 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).)

We independently review questions of statutory interpretation. In doing so, our fundamental task is to ascertain legislative intent so as to effectuate the statute's purpose. (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)

B

Obermueller bases his appeal on the fact he sent the pertinent messages to Kathy B.'s father and sister rather than to Kathy B. herself. He evidently thought that, by crossing out the names of the father and sister on the first restraining order, an earlier judge gave him some kind of a legal loophole. Obermueller's attorneys carried this theme over to his trial. Now it is the thesis of his appeal.

There was never a loophole. A limitation on a restraining order is not a license to stalk.

The stalking statute forbids harassing and threatening others. *How* a threat is conveyed is not legally pertinent, so long as the prosecution establishes the statutory elements, including that the stalker made a threat with a sufficiently culpable intent.

Our first task, then, is to specify exactly what the prosecution must prove on this score.

1

The prosecution must prove a stalking defendant *recklessly* made a threat that put the victim in fear. This mental state requires the prosecution to show that the defendant *consciously disregarded a substantial risk* that his communications would be viewed as threatening harm. We explain.

The statute makes clear *some* intent requirement is necessary, but it does not specify *what level* of intent is the right one. (See § 646.9, subd. (a) ["makes a credible threat with the *intent* to place that person in reasonable fear," italics added].)

We thus interpret the statute to decipher legislative intent.

We have the advantage of two authoritative and prestigious guides: the Supreme Court of the United States and the Model Penal Code.

This guidance is from the recent decision of *Counterman v. Colorado* (2023) 600 U.S. 66 (*Counterman*), which applied the Model Penal Code's astute mental state analysis to a stalking statute similar to section 646.9. (See *id.* at pp. 70–71, fn. 1 [partial text of statute].)

*Counterman* gives us valuable guidance. This federal constitutional holding is not controlling, for we face a question of state statutory law. But because of its acuity and its factual and

legal resemblance to this case, *Counterman* is highly persuasive. We give it close attention.

Billy Counterman sent hundreds of Facebook messages to C.W., a local singer and musician. The two had never met, and C.W. did not respond. C.W. repeatedly tried to block Counterman, but he created new accounts and continued to plague her with more messages C.W. interpreted as threatening. His messages terrorized her and "upended her daily existence." (*Counterman, supra*, 600 U.S. at p. 70.) A jury convicted Counterman of repeatedly making "any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress." (*Ibid.*)

We pause for emphasis. The *Counterman* statute required a communication that would *cause distress*. Our statute requires a threat with the intent to *put the victim in fear*. (§ 646.9.) These stalking statutes thus are very similar. The similarity extends to facts as well, for both cases are about stalkers using computers as their main tool.

We continue with Counterman, whose appeal argued that the First Amendment required the prosecution to prove *he* was aware of the threatening nature of his statements. (*Counterman, supra*, 600 U.S. at p. 71.) He claimed proof of his *subjective* awareness that his words had a threatening character was essential to avoid chilling protected, non-threatening speech. (*Id.* at pp. 72–73.)

Counterman's appeal thus posed two questions. (1) *Did* the prosecution have to prove he had some intent to put C.W. in distress? (2) If so, *what* level of intent was required? The Supreme Court gave two clear answers. (1) Yes. (2)

12

Recklessness.  (*Counterman, supra*, 600 U.S. at pp. 69, 77–78, 79–80.)

The first holding has no application here, for the California statute already requires *some* level of intent to place a victim in fear.  (See § 646.9, subd. (a) [any person "who makes a credible threat with the *intent* to place that person in reasonable fear," italics added].)

The second holding, however, addresses precisely the question we must answer:  exactly *what* level of "intent" must the prosecution prove?

We relate *Counterman*'s analysis of this key point in detail.

"The law of *mens rea* offers three basic choices.  *Purpose* is the most culpable level in the standard mental-state hierarchy, and the hardest to prove.  A person acts *purposefully* when he consciously desires a result—so here, when he wants his words to be received as threats.  Next down, though not often distinguished from purpose, is *knowledge*.  A person acts *knowingly* when he is aware that a result is practically certain to follow—so here, when he knows to a practical certainty that others will take his words as threats.  A greater gap separates those two from *recklessness*.  A person acts *recklessly*, in the most common formulation, when he consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another.  That standard involves insufficient concern with risk, rather than awareness of impending harm." (*Counterman, supra*, 600 U.S. at pp. 78–79, italics added and citations, brackets, and quotation marks omitted; cf. Model Pen. Code § 2.02, subd. (2) [1962 source for these definitions of culpability levels].)

13

The *Counterman* decision "complete[d] the mens rea hierarchy" by noting "the last level is *negligence . . . .* A person acts *negligently* if he is not but should be aware of a substantial risk—here, that others will understand his words as threats. That makes liability depend not on what the speaker thinks, but instead on what a reasonable person would think about whether his statements are threatening in nature." (*Counterman, supra*, 600 U.S. at p. 79, fn. 5, italics added and citations, brackets, and quotation marks omitted; cf. Model Pen. Code § 2.02, subd. (2)(d) [1962 source for this definition of negligence culpability].)

The *Counterman* decision rejected negligence as a standard for criminal liability in this situation, and its decision accords with the atypical place the negligence standard occupies in the criminal law. Legislatures occasionally make negligence the basis for criminal liability, but those instances are the exceptions rather than the rule. The general rule in criminal law is that negligence is usually not enough.

"Among [the remaining] standards, recklessness offers the right path forward." (*Counterman, supra*, 600 U.S. at p. 79.) The high court stressed the vital importance of "protecting against the profound harms, to both individuals and society, that attend true threats of violence—as evidenced in this case. . . . The injury associated with those statements caused history long ago to place them outside the First Amendment's bounds. When despite that judgment we require use of a subjective mental-state standard, we necessarily impede some true-threat prosecutions. And as we go up the subjective *mens rea* ladder, that imposition on [state prosecutors'] capacity to counter true threats becomes still greater—and, presumably, with diminishing returns for protected expression. In advancing past recklessness, we make it

14

harder for a [prosecutor] to substantiate the needed inferences about *mens rea* (absent, as is usual, direct evidence). And of particular importance, we prevent States from convicting morally culpable defendants. For reckless defendants have done more than make a bad mistake. They have consciously accepted a substantial risk of inflicting serious harm." (*Counterman, supra*, 600 U.S. at pp. 79–80, citations omitted.)

We agree with, and adopt, this statutory interpretation as a matter of California law. We thus interpret subdivision (a) of section 646.9 to be satisfied by proof that defendants *consciously disregarded a substantial risk that their communications would be viewed as threatening harm.*

2

Obermueller consciously disregarded a substantial risk that his communications would be viewed as threatening harm.

The evidence on this score was overwhelming.

Out of the blue and after 30 years of no contact, Obermueller located his junior high school girlfriend online and attempted to reignite the flame. When Kathy B. rejected his advances, he began a campaign of harassment against her that led to his 2021 conviction. When Obermueller perceived an initial restraining order had not barred him from contacting her father and sister, he exploited what he wrongly believed was a legal loophole.

Obermueller shifted his email onslaught to family members, despite knowing they probably would continue to forward the messages to Kathy B. herself, as he knew they had done in the past.

What Obermueller did *not* shift was his obsession with Kathy B. He wrote about "Kathy," about the prom kiss he

15

wanted from her, about her childhood pets, and about the restraining order she had obtained against him. He mixed these references with talk of guns, ammunition, knives, sharpened scissors, killing pets, and "live free or die."

Whether Obermueller *knew* others would perceive his messages as threatening is not the statute's test. Rather, the issue was whether he *consciously disregarded a substantial risk* that his communications would be viewed as threatening harm. On this question there can be no debate, for his 2021 stalking conviction drove home to him the probability of striking fear into Kathy B.'s heart. Despite this consciousness of risk, Obermueller proceeded.

Obermueller's emails were *completed* stalking. His crime was complete when he continued his course of harassment against her and consciously disregarded a substantial risk that his emails would be viewed as his effort to put Kathy B. in fear.

3

Obermueller's argument that, after April 2021, he never sent messages directly to Kathy B.'s personal email address is irrelevant. The statute has no requirement of direct contact with a victim. The statutory words erect no such rule. Neither does the case law. (E.g. *People v. Norman* (1999) 75 Cal.App.4th 1234, 1241, fn. 4 [stalker did not contact victim].)

A rule requiring direct contact would counter the statutory purpose of protecting victims, for it would merely encourage stalkers to shift to indirect but still-frightening methods.

Obermueller's threats violated the statute. His stalking was completed stalking, not attempted stalking. The trial court was right not to instruct on attempt, for there was no substantial evidence from which a rational jury could conclude that

16

Obermueller committed the lesser offense but not the greater one.  (See *Williams, supra*, 61 Cal.4th at p. 1263.)

**DISPOSITION**

We affirm.

WILEY, J.

We concur:


STRATTON,  P. J.


GRIMES, J.