Filed 2/27/25

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099609 |
| Plaintiff and Respondent, | (Super. Ct. No. 23FE006809) |
| v. | |
| DAVID PAUL PLANCHARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Alexander J. Pal, Judge. Affirmed.

Brad L. Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant David Paul Planchard guilty of stalking Debra Doe and violating a protective order. On appeal, he contends that the stalking statute required the People to have proven he made persistent attempts to directly contact Doe. Because his harassing and threatening messages were publicly posted on Facebook rather than sent directly to her, he argues they could not be used to establish a harassing course of conduct directed at her and the People's evidence was insufficient to sustain his conviction. He also raises several challenges related to the admission of the posts. We affirm.

## LEGAL AND FACTUAL BACKGROUND

Doe was in a relationship with Planchard from 1997 to 2000. Despite the ending of the relationship, they had a son together in 2006. His name is J., and Doe has sole custody of him. Doe also has two daughters, named A. and Ja.

In 2015, Planchard was convicted of stalking Doe. Since that conviction, Planchard has continued efforts to contact Doe, including through other people who tried to pass on his messages. In 2020, Doe obtained a restraining order against Planchard, pursuant to the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.). This five-year order included a 200-yard stay-away provision from Doe and her residence and included J. as a protected party. The conduct at issue here allegedly spanned from 2016 to 2023.

In 2015, Heather T. became friends with Planchard on Facebook. Planchard sent Heather messages from his Facebook account. Heather became friends with Doe in 2016. From that point on, Planchard regularly asked Heather to relay messages to Doe. Planchard repeatedly told Heather, "You tell that bitch that I want to talk to my son. You tell that bitch that if I don't get to talk to my son, God is going to do something horrible to him."

Although Heather ultimately discontinued her Facebook "friend" status with Planchard, she continued to monitor his public posts between 2018 and May 2023. When the posts were disturbing or threatening, she took a screenshot of them and shared them

2

with Doe. Heather also discussed them with Planchard, who admitted that he posted them. For example, in 2018, Planchard posted pictures of convicted rapists and murderers: Ted Bundy, Richard Ramirez, and Richard Allen Davis. According to Heather, Planchard included an associated caption: "[Doe], I should sic them on you." Another post by Planchard stated, "I'M SO SORRY FOR WISHING DEATH AND RAPE ON [DOE]."

At some point in 2018 or 2019, at Planchard's insistence, Heather met him in person for the first time. He contacted her in an effort to get messages to Doe and to see his son. When Heather told him she would not deliver his message to Doe, he told her he was "going to kill both you bitches."

The posts saved by Heather were admitted at trial as People's exhibit No. 2.[1] Other people saw these or similar posts. Doe, who has her own Facebook account under a false name, could independently see Planchard's posts because they were public. Doe saved some of the posts made in April and May 2023, and they were introduced as People's exhibit No. 3. Doe's daughter Ja. also saw several of Planchard's posts about herself and her mother (some of which were sexually explicit) and sent some of them to Doe.

Planchard did not send or tag these posts to Doe, but they remained publicly available. We categorize them into four categories. The first category of posts includes several messages about Doe, specifically calling her by name, including: "[Doe] is having a 3 some tonight with 2 other guys" including her family law attorney (by name),

---

[1]  People's exhibit No. 2 contains four subparts: the first is labeled No. 2A—David's Facebook posts April 2023; the second is labeled No. 2B—David's Facebook posts April, May 2023; the third is No. 2C—David's Facebook posts January 2019; and finally, the fourth is No. 2D—David's Facebook posts 2018.

"[Doe] is a f - - - - - g slut," and "[Doe] go f - - k yourself you loose c - - t."[2]  When Planchard did not include Doe's name, he included a photo of Doe with children,[3] with captions expressing his disdain for her or containing derogatory comments about her body.

In the second category, Planchard repeatedly referenced that Doe had been raped when she was younger.  In one post, Planchard posted a picture of the man whom Doe claimed raped her[4] next to the picture of Doe, J., and Doe's niece with the caption, "This [N-word][5] raped [J.]'s mom [Doe]," and made several more posts with the same photo, naming the alleged rapist and purportedly providing details of the rape.  Planchard also posted the picture of Doe with the caption, "[ALLEGED RAPIST][6] F - - K THAT C - - T F - - K HER [N-WORD]," and another with the caption, "SHE PROBABLY DESERVED . . . RAPES BY [ALLEGED RAPIST] . . . .  F - - - - - G COCK TEASE."  Planchard also posted a picture of the alleged rapist with the caption, "He should have used a knife," and another post stating:  "THAT'S WHAT [ALLEGED RAPIST] THINKS ABOUT YOU [¶]  AND SO DO I  [¶]  YOU ARE NOT WORTH MORE THAN A BOX OF PIZZA YOU F - - - - - G C - - T" and "I HATE YOU WITH ALL OF MY HEART [DOE]  [¶] SUCK MY DICK BITCH  [¶]  CHOKE ON IT FOREVER AND EVER AND EVER!! [¶]  F - - K YOU SKANK!!  [¶]  YOU F - - - - - G WHORE."

---

[2]     We choose to redact Planchard's language throughout this opinion.

[3]     Planchard repeatedly used the same photo, which Doe testified consisted of her, her son J., and her niece.

[4]     At trial, Doe testified the photo was a picture of the man who raped her.

[5]     We choose to redact Planchard's use of racially charged language.

[6]     The record does not contain any information regarding criminal prosecution or other legal adjudication of that allegation.  We shall omit his name as it appeared in the posts and replace it with [alleged rapist].

In the third category of posts, Planchard made comments about their son, J., as well as Doe's father and daughters Ja. and A., including: "Little sissy bitch [¶] f - - k you [J.] and f - - k your Mom," "[father] I[']ll body slam you quicker than you can say beans and rice," and "I LOVE YOU [A.] I SOMETIMES MASTURBATE TO YOU." Ja. also testified that, on social media, Planchard called her a murderer and other insults and asked her out on a date. He addressed her by name while threatening her family. Ja. felt "very scared," like she "was not safe and that, at any moment, something terrible could happen to [her] or [her] loved ones, and [she] felt trapped in the situation."

In the fourth and final category, Planchard made it clear that he would not stop his messages: "YOU ARE 55 YOU OLD SNATCH [¶] I[']LL F - - - - - G WEAR YOU DOWN," "i don't care anymore bitch. I[']ll just get out and f - - k your life somemore," and "Remember if you put me back in jail [¶] Do you remember what i said [Doe]?"

Around 5:30 a.m. on May 9, 2023, Planchard showed up at Doe's house where she lived with her mother, her father, and J. Planchard yelled, screamed, and tried to kick in the front door. He called out for Doe's father and called Doe a "bitch," "f - - - - - g whore" and "f - - - - - g c - - t." Planchard left on foot and left behind a stuffed animal and flowers on Doe's father's car. Planchard was arrested later that day.

According to Doe, Planchard's "constant threats, the Facebook posts, and his mental health" made her feel "very anxious, very scared, not safe." The morning he showed up at her house, Doe "was really scared. [She] knew that [his] mental health had been declining, so [she] wasn't really sure what he was capable of doing."

The jury found Planchard guilty of stalking (Pen. Code, § 646.9, subd. (b);[7] count one) and misdemeanor violation of a protective order based on his visit to her house on May 9 (§ 273.6, subd. (a); count two). The jury also found true the allegations that a

---

[7] Undesignated statutory references are to the Penal Code.

5

temporary restraining order was in place during the crime, that Planchard had suffered a prior stalking conviction (§ 646.9, subd. (c)(2)), and that the crime involved a high degree of cruelty, callousness, or viciousness (Cal. Rules of Court, rule 4.421(a)(1)).

The trial court sentenced Planchard to the upper term of five years for count one and a stayed term of six months for count two (§ 654).

Planchard timely appealed.

## DISCUSSION

### I

### *Evidence of Conduct Directed at Doe*

Although Planchard agrees that the content of his Facebook postings often focused on Doe and her family, he contends there is no evidence that he directed any conduct at Doe as required by section 646.9 because his posts did not constitute persistent attempts to make actual contact with Doe or her family. Accordingly, he contends, there is insufficient evidence of two or more instances of persistent direct contact with Doe and his conviction must be reversed. We disagree.

A. *Section 646.9 requires conduct directed at Doe*

Section 646.9 provides in relevant part: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for their safety, or the safety of their immediate family, is guilty of the crime of stalking." (§ 646.9, subd. (a).) The term " 'harasses' " means "engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) The statute defines " 'course of conduct' " as "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (§ 646.9, subd. (f).) A " 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or

6

a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for their safety, or the safety of their family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for their safety or the safety of their family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

Planchard contends that the statutory language "conduct directed at a specific person" requires the prosecution to prove that he made persistent efforts to make direct contact with Doe to constitute harassment. We independently review questions of statutory interpretation. (*People v. Obermueller* (2024) 104 Cal.App.5th 207, 217 (*Obermueller*).) In doing so, we look first to the language of the statute, giving effect to its " ' "plain meaning." ' " (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562; see also *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["If the [statutory] language is clear and unambiguous[,] there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature"].)

A review of the plain language of the statute reveals that while section 646.9 requires the victim to become aware of the stalker's conduct, there is no requirement that the defendant himself or herself must make the victim aware of the conduct to constitute "harassing" for purposes of the stalking statute. Furthermore, the question of whether direct contact with the victim is required to satisfy the stalking statute was recently addressed by the Second District in *Obermueller*, *supra*, 104 Cal.App.5th 207. In that case, the dating relationship between the defendant and the victim ended decades before the defendant began to send her messages over the Internet and e-mail. (*Id.* at pp. 211-212.) He also created a Web site devoted to publicly posting reasons why the victim should be his wife. (*Id*. at p. 213.) In 2019, the victim obtained a restraining order against the defendant and in 2021, the defendant was convicted of stalking the victim. At the trial for the 2021 stalking charge, the victim testified that the defendant e-mailed her

7

father and sister about her, and they forwarded the messages to her. (*Ibid*.) After the defendant's 2021 conviction, the defendant continued to send messages about the victim to the victim's father and sister. (*Id*. at p. 214.) In 2022, the defendant was again convicted of stalking. (*Id*. at p. 216.)

On appeal, the defendant argued that he was entitled to a jury instruction on *attempted* stalking because he never directly contacted the victim—only her father and sister. (*Obermueller*, *supra*, 104 Cal.App.5th at p. 216.) The appellate court disagreed, finding that the defendant's behavior constituted completed stalking, and explained that the statutory language requires the defendant to make a credible threat, but left open how the defendant conveys this threat. (*Ibid*.; § 646.9, subd. (a).) The court recognized that "[s]talkers can be imaginative" and emphasized "*how* a stalker proceeds does not matter, so long as the prosecution proves the stalker made 'a credible threat with the intent to place that person in reasonable fear . . . .' (§ 646.9, subd. (a).) Threats conveyed only by messengers can be fully effective in terrorizing a target, as they were in this case." (*Obermueller*, at pp. 211, 216.) The court further reasoned that the defendant's "tactic of confining his e-mails" to people other than the victim "was legally irrelevant" to the elements of stalking as was the lesser included offense instruction. (*Id.* at p. 216; see also *id*. at p. 218.) The court continued: "The statute has no requirement of direct contact with a victim. The statutory words erect no such rule. Neither does the case law. [Citation.] [¶] A rule requiring direct contact would counter the statutory purpose of protecting victims, for it would merely encourage stalkers to shift to indirect but still-frightening methods." (*Id*. at pp. 221-222.) The court concluded that the defendant was not immunized by shifting his e-mails to family members, "knowing they probably would continue to forward the messages" to the victim herself. (*Id*. at p. 221.)

*Obermueller* finds support in other analogous case law. Combined, these cases lead us to conclude that the stalking statute is satisfied by Planchard's harassing conduct. For example, in *People v. Norman* (1999) 75 Cal.App.4th 1234, the appellate court

8

determined that for purposes of a credible threat, it is irrelevant that a victim learns of a stalker's threats through a third party rather than directly from the stalker. (*Id*. at p. 1241, fn. 4.) There, the defendant was convicted of stalking Steven Spielberg. (*Id*. at pp. 1235-1236.) Spielberg was out of the country when the defendant, among other things, tried to scale the wall of Spielberg's residence and admitted he wanted to rape Spielberg. (*Id*. at pp. 1236-1238.) Spielberg's lawyer ultimately told Spielberg of the defendant's conduct, which caused Spielberg to fear for the safety of himself and his family. (*Id*. at p. 1237.)

In affirming the defendant's conviction for stalking, the court rejected his claim that the victim's fear must be contemporaneous with the stalker's threats and harassment in order to violate section 646.9. (*People v. Norman*, *supra*, 75 Cal.App.4th at pp. 1238-1239.) The court stated it was "obvious" that "there is nothing in the language of the statute to require a concurrence of act and reaction." (*Id*. at p. 1239.) The court also summarily found sufficient evidence supported his conviction, rejecting the defendant's claim that his threats were not credible or Spielberg's fear was unreasonable because Spielberg was out of the country at the relevant time. The court simply stated, "The fact that Spielberg learned about Norman's threatening conduct from [his attorney] is irrelevant—it was Norman whose course of conduct . . . was threatening and which created a foreseeable need to inform Spielberg of the danger." (*Id*. at p. 1241, fn. 4.)

Similarly, in *People v. McPheeters* (2013) 218 Cal.App.4th 124, another panel of this court considered whether the jury had to be instructed that threats made by the defendant about the victim to a third party constituted a credible threat under the statute only if the defendant intended that those threats be conveyed to the victim. (*Id*. at p. 131.) In that case, the defendant told an arresting officer that his arrest did not matter and " 'he was going to be out [of jail] in 20 minutes . . . and he was going to go back to [the victim's] house immediately.' " (*Id*. at p. 130.) The officer relayed the threat to the on-call judge, which resulted in increased bail. In response, the defendant stated, " 'When I get out of here, if I shoot her, there's nothing you can do about it.' " (*Id*. at

9

p. 131.)  The officer relayed these statements to the victim.  (*Ibid*.)  The court discussed the analysis in *Norman*, and noted that "*Norman*'s conclusion is supported by other opinions that provide, ' "in determining whether a threat occurred [under section 646.9], the entire factual context, including the surrounding events and the reaction of the listeners, must be considered." ' "  (*Id*. at p. 138.)  Where it was "reasonably foreseeable" that the defendant's conduct and comments would prompt the third party to inform the victim about the nature of the statements, a jury can infer the defendant intended the third party to relay the messages to the victim.  (*Ibid*.)  Ultimately, a "court 'cannot ignore what a victim knows about a defendant, *regardless of how it is learned*, in assessing whether a defendant's behavior rises to the level of a credible threat.' "  (*Ibid*.)

Planchard relies on two cases for the proposition that the statutory requirement that the defendant engage in a "course of conduct directed at" the victim means persistent efforts to make actual contact with the victim.  The cases he cites, however, do not assist him because harassment was conceded in each case, and the issue was whether or not each defendant's conduct constituted a credible threat.  For example, in *People v. Lopez* (2015) 240 Cal.App.4th 436, 449, the defendant conceded the evidence showed he harassed the victim (through completed or attempts to make direct contact with her) but argued that there was no evidence that he communicated a willingness to use violence against her.  (*Id*. at pp. 599-600.)  Similarly, in *People v. Frias* (2024) 98 Cal.App.5th 999, the defendant sent the victim messages on her Facebook account, despite her repeated attempts to block the messages.  (*Id*. at p. 1018.)  The defendant also watched her through her apartment window and showed up uninvited more than once.  (*Id*. at pp. 1018-1019.)  As with the defendant in *Lopez*, he did not contest that his conduct was harassing but contended that the evidence did not show he made a credible threat and acted with the intent to place the victim in fear for her safety.  (*Id*. at p. 1017.)  Because the element of harassment was conceded, neither the *Lopez* nor the *Frias* court had any occasion to engage in statutory interpretation and/or determine the parameters of

behavior that constitutes harassment. Simply because the *Lopez* and *Frias* defendants conceded their repeated direct contact constituted harassment of their respective victims does not translate to a general rule that such repeated direct contact with a victim is required for purposes of stalking. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 589 ["statements unnecessary to a court's decision are not binding precedent"].)

In light of the above precedent, we reject Planchard's claim that the statutory requirement that he engage in a course of conduct directed at Doe means that he must make persistent efforts to directly contact her. Rather, it is sufficient that the nature of the conduct makes it reasonably foreseeable that the victim would become aware of it. To hold otherwise would thwart "the statutory purpose of protecting victims, for it would merely encourage stalkers to shift to indirect but still-frightening methods." (*Obermueller*, *supra*, 104 Cal.App.5th at p. 222.)

B. *Sufficient evidence supports the stalking conviction*

To find Planchard guilty of stalking, the jury had to find that he: (1) repeatedly followed or harassed Doe; (2) made a credible threat; and (3) did so with the intent to place Doe in reasonable fear for her or her family's safety. (See *People v. Frias*, *supra*, 98 Cal.App.5th at p. 1016; see also CALCRIM No. 1301.)

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) "[A]n appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

11

Contrary to Planchard's contention, there is substantial evidence supporting his stalking conviction. Indeed, we need only cite a few of Planchard's vulgar, harassing, and threatening statements that, in addition to his act of coming to Doe's residence, satisfy the stalking statute. For example, in several Facebook posts made in April and May 2023, Planchard broadcasted not only the fact that Doe had been raped, but named her alleged rapist, included a photo of the alleged rapist next to Doe, and purportedly disclosed details of the rape while posting comments that could reasonably be interpreted as approval of the violence inflicted upon Doe, with a desire that more should have been inflicted. Planchard posted: "[ALLEGED RAPIST] [¶] F - - K THAT C - - T"; "F - - K HER [N-WORD]"; "He should have used a knife" (over a picture of the alleged rapist); and "THATS WHAT [ALLEGED RAPIST] THINKS ABOUT YOU [¶] AND SO DO I," before demanding that "[DOE] [¶] SUCK MY DICK BITCH [¶] CHOKE ON IT FOREVER AND EVER AND EVER!!" Planchard's posts continued over the course of multiple years, and he expressed intent to continue to harass Doe. Planchard posted, "if you put me back in jail [¶] Do you remember what i said [Doe]?" Accompanied by the same photo of Doe used in many of his posts, Planchard also said, "i don't care anymore bitch. i[']ll just get out and f - - k your life somemore," "I[']LL F - - - - - G WEAR YOU DOWN." These are not simply "public dissemination of unflattering content" about Doe, as Planchard insists. The messages convey a desire to either perform violent sexual acts and/or encourage others to do so and are "threats" that " 'pose a danger to society.' " (*People v. Lopez*, *supra*, 240 Cal.App.4th at p. 453.)

Planchard used Facebook, the structure and common usage of which ensures the communication is received by another user. (See *Packingham v. North Carolina* (2017) 582 U.S. 98, 104 [social media platforms constitute "the most important places (in a spatial sense) for the exchange of views" and "offers 'relatively unlimited, low-cost capacity for communication of all kinds' "].) Any user has the potential to become a third party who may relay the message to the victim. Or, as is the case here, the user may

12

be the victim herself. Indeed, Planchard made no effort to privatize or limit the dissemination of the posts. Instead, by making the posts public, he demonstrated an intent to be heard by someone—even by Doe. The fact that Planchard did not send these posts directly to Doe is irrelevant. What matters is that, when Doe did learn of his acts and threats, she suffered the requisite fear. (See *People v. Norman*, *supra*, 75 Cal.App.4th at p. 1240 [concluding the fact that the victim was not home when the defendant attempted to gain access to the residence "cannot diminish [the defendant's] criminal responsibility for his course of conduct" in stalking the victim].)

Planchard's reliance on *People v. Peterson* (2023) 95 Cal.App.5th 1061 is inapt. In *Peterson*, the defendant was convicted of stalking for conduct that consisted of his reposting on Facebook a publicly available photo of a politician's family, along with comments mentioning the politician's daughters' absence from a recent open house event (*id*. at p. 1064), and his mailing of a " 'confusing' " letter to the politician's wife criticizing local politics and accusing many local politicians of being liars (*id*. at p. 1065). With this letter, the defendant enclosed a check made payable to " 'anyone who is not corrupt.' " (*Ibid*.) On appeal, the court concluded that the defendant's stalking conviction rested entirely on his speech, which unquestionably occurred in a First Amendment context. Thus, "as a matter of law," his speech acts were not true threats but rather constitutionally protected speech and, therefore, did not constitute stalking. (*Id*. at pp. 1068, 1071.)

In contrast, Planchard does not raise a First Amendment claim. Unlike in *Peterson*, the nature of the posts here was undoubtedly threatening. The content of Planchard's posts was sufficiently alarming such that it was reasonably foreseeable that the posts would prompt another to pass them on to Doe. And, as Heather discussed the posts she saw from Planchard, it was foreseeable that Heather would do so herself. Indeed, as Planchard repeatedly tried to get Heather and others to relay other messages to Doe, there is no reason to believe that he intended to keep his harassing Facebook posts

13

from Doe. It is clear he wanted Doe to see them. " '[I]n determining whether a threat occurred, the entire factual context, including the surrounding events and the reaction of the listeners, must be considered.' [Citation.] We therefore cannot ignore what a victim knows about a defendant, regardless of how it is learned, in assessing whether a defendant's behavior rises to the level of a credible threat." (*People v. Uecker* (2009) 172 Cal.App.4th 583, 598, fn. 10.) Under these circumstances, we conclude there was sufficient evidence of Planchard's stalking.

## II

### *Ineffective Assistance of Counsel*

Planchard contends that he was denied constitutionally effective counsel when his counsel failed to object to the Facebook posts. Specifically, he asserts that counsel should have objected on foundational grounds to the publication of the Facebook posts during Heather's testimony as well as on the basis that they misled or confused the jury. He also contends specific posts were irrelevant. Therefore, counsel should have objected under Evidence Code section 350 and counsel should have requested a limiting instruction for two of these posts. Finally, Planchard contends counsel was ineffective for failing to object to certain posts every time they were published by the prosecutor. We reject each of these claims.

A. *Additional background*

Prior to trial, defense counsel sought to exclude the Facebook posts as "lacking foundation, authentication, and [being] more prejudicial than probative" under Evidence Code section 352. Counsel's basic argument was that there was no way to establish that Planchard actually wrote the posts and, because several of the posts contained information about people other than Doe, they were more prejudicial than probative. Counsel argued that additional posts containing information about others would only serve to inflame the jury and/or confuse the issues. The court denied defense counsel's request to summarily preclude the introduction of the Facebook posts but ruled that the

14

People had to lay a proper foundation and authenticate them at trial for them to be admissible.

B. *Standard of review*

A criminal defendant has a right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) In order to establish ineffective assistance of counsel, a defendant must show both that (1) his or her trial counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) that the deficient performance prejudiced the defendant in that it is reasonably probable the defendant would have obtained a better result but for counsel's defects. (*Strickland*, at p. 689; *Ledesma*, at pp. 216-218.)

Except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel generally must be raised in a petition for writ of habeas corpus based on matters outside the record. (*People v. Salcido* (2008) 44 Cal.4th 93, 172.) This is particularly so where the asserted deficiency arises from trial counsel's failure to object to evidence, because deciding whether to object is inherently tactical, and failure to object rarely establishes ineffective assistance of counsel. (*Ibid.*)

Unless a defendant establishes the contrary, we presume trial counsel's performance fell within the wide range of professional competence and that counsel's action or inaction can be explained as a matter of sound trial strategy. (*People v. Centeno* (2014) 60 Cal.4th 659, 674-675.) When the record on direct appeal sheds no light on why trial counsel failed to act in the manner challenged, the defendant must show there was no conceivable tactical purpose for counsel's act or omission. (*Ibid.*)

15

C.  *Evidence Code section 403*

Planchard contends that when the prosecution sought to publish People's exhibit No. 2, counsel was required to object under Evidence Code section 403, subdivision (a)(1).  Under Evidence Code section 403, subdivision (a)(1), when " '[t]he relevance of . . . proffered evidence depends on the existence of [a] preliminary fact,' " the " 'proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact. . . .' " (*People v. Cottone* (2013) 57 Cal.4th 269, 283, italics omitted.)

According to Planchard, the posts in exhibit No. 2 were not relevant because they did not show his conduct was directed *at* Doe but rather supported the prosecution's invalid theory of stalking as argued above (i.e., that the public dissemination of his comments was sufficient to satisfy § 646.9).  We have already rejected Planchard's contention that because the posts were not sent directly to Doe they cannot establish a course of harassing conduct directed at Doe.  As we have concluded, Planchard's conduct is not immunized by making his posts available to the Facebook public under circumstances where it is reasonably foreseeable that either Doe would see them or they would be relayed to her by a third party.  Thus, contrary to Planchard's contention, the Facebook posts were relevant to, and factually supported, the allegation that he engaged in harassing and/or threatening conduct directed at Doe.  Accordingly, Planchard's evidentiary contentions based on the theory of stalking fail and counsel could not be ineffective for failing to object to the admission of the evidence on that basis alone.  "Counsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

Planchard further claims that because exhibit Nos. 2C and 2D were posts from 2018 and 2019 respectively, they were not relevant to the charge of violating a protective order issued in 2020, as alleged in count two.  We agree.  The alleged basis for the charge

16

of violating a protective order in count two was Planchard's act of coming to her house on May 9, 2023, and not the Facebook posts. However, the 2018 and 2019 posts, as well as the evidence of Planchard's visit on May 9, were all relevant to establish a harassing course of conduct directed at Doe, as alleged in count one for stalking. As these two offenses were "connected together in their commission," the jury was allowed to hear evidence of each. (§ 954.) The evidence underlying the charges was relatively straightforward and distinct and the evidence related to each charge was independently ample to support Planchard's conviction of both crimes. Planchard fails to discuss any potential prejudicial spillover from the admission of the posts as applied to count two. (See *People v. Benavides* (2005) 35 Cal.4th 69, 92-93 ["To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense"].) Thus, Planchard's contention that none of the 2018 or 2019 Facebook posts could establish a violation of the order, while technically correct, misses the mark.

D. *Evidence Code section 352*

Planchard claims his counsel's failure to object to the publication of every post in People's exhibit No. 2 under Evidence Code section 352, on the basis that the evidence was confusing or misleading, constituted ineffective assistance of counsel. We disagree.

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

17

As we have previously concluded, the posts were relevant to the valid theory that Planchard stalked Doe.  Accordingly, we reject Planchard's argument that exhibit No. 2 was more prejudicial than probative because the posts supported an invalid theory.  Contrary to Planchard's assertions, the publication of exhibit No. 2 during Heather's testimony did not mislead the jury that these posts were communications made directly to Doe.  Rather, Heather testified that she saw the posts, Planchard confirmed to her that he wrote them, and she saved and showed them to Doe.  Even if Heather did not identify each individual post as one she shared with Doe, we fail to see how that renders them more prejudicial than probative and thus inadmissible under Evidence Code section 352, as the argument is framed by Planchard.  We are convinced the evidence was relevant and, as they contained statements about Doe or even addressed Doe, there was not a substantial likelihood the jury would have used them for any purpose other than to determine whether Planchard's statements harassed and/or threatened Doe for stalking purposes.  Accordingly, Planchard fails to demonstrate that an objection on Evidence Code section 352 grounds would have been successful.  (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1131.)

Nevertheless, Planchard claims counsel was ineffective for failing to specifically object each time certain exhibits were published.[8]  These specific posts contained photos of Doe or of the person Doe testified raped her, with Planchard's commentary.  Five of the seven posts expressed approval of the rape, stating, "[ALLEGED RAPIST]  [¶]

---

[8]     Planchard also contends, without analysis, that defense counsel should have objected to People's exhibit Nos. 2C4 and 2D7 because they appear to be duplicates.  However, Heather testified that the exhibits labeled with the prefix "2C" were Planchard's posts from January 2019 and the exhibits labeled with the prefix "2D" were Planchard's posts from 2018.  Thus, the jury was free to consider whether Planchard made the same comment, "I[']M SO SORRY FOR WISHING DEATH AND RAPE ON [DOE]" two separate times.  This does not give rise to an obligation to object under Evidence Code section 352.

18

F - - K HER [N-WORD]," and the other two described the details of the rape. Planchard complains that because he was not on trial for a hate crime, his racist language had no probative value and only served to build juror animus against him.

Here, the racial animus exhibited in the posts at issue were directed at the alleged rapist. The threatening, harassing conduct directed at Doe were Planchard's comments approving of the sexual violence committed against her by her alleged rapist. Planchard's posts in their totality were relevant to show the context of the messages so that the jury could determine whether his conduct was threatening and/or harassing to Doe. There was no risk of confusing the jury with the inclusion of the "N-word" in light of the instructions that required the jury to evaluate Planchard's conduct *directed at Doe*. (CALCRIM No. 1301.)

Ultimately, Planchard's arguments under Evidence Code section 352 fail because he does not address the issue of prejudice. (See *People v. Benavides*, *supra*, 35 Cal.4th at pp. 92-93; *In re Cox* (2003) 30 Cal.4th 974, 1019 ["There are two components to an ineffective assistance of counsel claim: deficient performance of counsel and prejudice"].) Indeed, in light of the overwhelming evidence of his harassing and threatening conduct directed at Doe, there was no risk that the jury found Planchard guilty of stalking in an effort to "punish" him for his racist comments. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

E. *Evidence Code section 350*

Planchard contends that counsel should have objected to six individual posts that were not linked to Doe in any obvious way on relevancy grounds under Evidence Code section 350. Heather described exhibit No. 2B1 as referring to an individual named Allen—Planchard's friend. Exhibit No. 2B2 is a picture of a person's hand holding what appears to be a stone. Heather testified the post was made by Planchard but did not explain who was in the picture. The post contained the following text written above the photograph of the hand: "AND IT CONTINUES [¶] GET ON MY MIGHTY NUTS

19

[¶] OR I WILL LEAVE YOU IN THE DUST." Exhibit No. 2C1 only consists of text and reads, "He can't eat her out like I can." Exhibit No. 2C2 shows a picture of an unidentified man with a message, "I[']LL F - - - - - G KILL U BITCH," and in exhibit No. 2C3 the same picture is captioned with, "I[']LL GOUGE OUT UR EYES." Finally, Exhibit No. 2D10 is a picture of a boy wearing a Superman T-shirt. Written above the picture is, "I WILL NOT BE STOPPED. I[']VE BEEN DOING THIS FOR A LOT LONGER THAN 1980."

Of course, only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Trial courts have broad discretion in determining relevance. (*People v. Burwell* (1955) 44 Cal.2d 16, 34.) On this record, we do not find that Planchard was denied his constitutional right to effective counsel where counsel failed to object to these posts on relevancy grounds.

Here, the posts were arguably relevant to corroborate that the Facebook account at issue was maintained by Planchard. Posts that were obviously made by him, such as the posts about his friend Allen, helped corroborate Heather's testimony that he wrote the posts associated with his account.

Moreover, the California Supreme Court has "often observed" that "whether or not to object to evidence at trial is largely a tactical question for counsel, and a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one. [Citation.] An attorney may well have a reasonable tactical reason for declining to object, and ' "[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312-1313.)

20

A possible tactical reason for counsel to refrain from objecting may be counsel's "desire[ ] not to highlight the evidence by making an objection. '[T]he decision whether to object, move to strike, or seek admonition regarding [undesired] testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony.' " (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1313, italics omitted.) This point is underscored by the nature of the posts at issue here when compared to other admissible posts. Indeed, in addressing prejudice, Planchard merely states the obvious: "These exhibits depicted [him] as vulgar, unhinged, and offensive." But the vulgarity of these complained-of posts paled in comparison to other posts made by Planchard such as those where he encouraged Doe's rape, lamented that her alleged rapist did not use a knife, or even that he masturbated to thoughts of Doe's daughter. Counsel could have strategically decided to not draw attention to these six posts, especially where counsel expected the jury to be sufficiently instructed on their consideration of evidence related to conduct directed at Doe.

F. *Limiting instruction under Evidence Code section 355*

Planchard contends counsel should have requested a limiting or sanitized instruction regarding People's exhibit Nos. 2C2 and 2C3 pursuant to Evidence Code section 355. Evidence Code section 355 provides, "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."

As discussed above, People's exhibit Nos. 2C2 and 2C3 show a picture of an unidentified man with the messages, "I[']LL F - - - - - G KILL U BITCH" and "I[']LL GOUGE OUT UR EYES." Although these posts were published to the jury, there was no testimony elaborating on them and they were not actually admitted into evidence. Because they were not admitted, Planchard's reliance on Evidence Code section 355 is

misguided. Moreover, to the extent he argues that the jury should have been specifically instructed to disregard the existence of those two posts, we disagree. The court instructed the jury with CALCRIM No. 222, which stated in part: " 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." As exhibit Nos. 2C2 and 2C3 were not admitted, the jury was precluded from considering them as evidence. This operated as a limiting instruction that eliminated any danger the jury could consider the evidence for an improper purpose. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83 [juries are presumed to follow the trial court's instructions].)

### III

### *Additional Evidentiary Concerns*

Planchard contends the trial court erred in allowing the prosecution to publish People's exhibit No. 3 because the posts did not constitute a course of conduct for stalking purposes. This argument is based on his theory that indirect Facebook posts cannot constitute harassing conduct directed at Doe—which we have already rejected. Accordingly, we reject his derivative argument that the evidence in People's exhibit No. 3 was irrelevant and therefore inadmissible.

Planchard further contends that the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have found no errors impacting his right to a fair trial.

22

## DISPOSITION

The judgment is affirmed.

/s/
EARL, P. J.

We concur:

/s/
MESIWALA, J.

/s/
FEINBERG, J.